UNITED STATES of America,
Plaintiff-Appellee,

v.

David L. HOFFMAN,
Defendant-Appellant.

No. 85–2252.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1986.
Decided Nov. 12, 1986.

Samuel J. Cahnman, Chicago, Ill., for defendant-appellant.

Jan E. Kearney, Asst. U.S. Atty., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS and COFFEY, Circuit Judges, and WILL, Senior District Judge.[*]

COFFEY, Circuit Judge.

The defendant, David Hoffman, appeals his conviction for threatening the life of the President of the United States. We affirm.

### I.

On December 17, 1984, the following letter was received in the White House mail room:

"Ronnie, Listen Chump! Resign or You'll Get Your Brains Blown Out."

At the end of the unsigned letter was a crude drawing of a pistol with a bullet emerging from the barrel. A mailroom employee opened the letter, observed and noted that the letter contained not only threatening words, but that also inscribed thereon was the threatening drawing of a gun with a bullet emerging therefrom. She placed the same and its envelope in a plastic evidence bag and forwarded it to the United States Secret Service, the federal agency charged with the responsibility of providing personal security for the President. An intelligence research specialist

with the Secret Service reviewed the letter and envelope and, after noting a Milwaukee, Wisconsin, postmark, notified the Secret Service's Milwaukee field office that the White House mail room had received the document. The letter and envelope were forwarded to the Forensic Service Division of the Secret Service where an "indentation analysis" (the process of bringing out indentations caused by previous writing on paper placed on top of the sheet under analysis) was performed. The indentation analysis procedure and handwriting comparisons established that a David Hoffman, residing at 2508 E. Bellview Place, Milwaukee, 53211, was the author of the letter.

On December 28, 1984, Hoffman was arrested by a Special Agent of the Secret Service and a Milwaukee Police Officer. After being advised of his constitutional rights, the defendant was confronted with a copy of the threatening letter and responded, stating "the letter wasn't signed and could be forged." He further stated "he didn't know it was against the law to threaten the President."

Hoffman was indicted and charged with violating 18 U.S.C. sec. 871(a) which provides:

"Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States ... or knowingly and willfully otherwise makes any such threat against the President ... shall be fined not more than $1,000 or imprisoned not more than five years, or both."

Before trial, the defendant filed a motion in limine:

"For an order excluding for use at trial any evidence or statements made by the

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

defendant to any witness in this action relating to the religious and political views of the defendant, inasmuch as the probative value of such statements is substantially outweighed by the danger of prejudice to this defendant."

In addition, the defendant submitted a proposed voir dire question dealing with the question of religious prejudice:

"Does anyone here have any bias or prejudice against the Unification Church or the Reverend Sun Yung Moon, and would that bias or prejudice prevent you from judging the facts in this case fairly and objectively?"

Responding to the defendant's motion in limine, the Government argued that the religious belief evidence "may be relevant—even essential—evidence to prove a violation of [sec. 871]...." Specifically, the government contended that the religious belief evidence was necessary to prove a "true threat" under sec. 871:

"In this case, the government intends to show 'that the threat letter was written by the defendant not as a joke or as part' of a political debate, but out of defendant's anger with the President for his failure to pardon Sun Yung Moon the leader of a religious group with which defendant was associated for a time and to whom he retained loyalty. This information is critical to an understanding of the context of the statement and of the willfulness of defendant in making it."

At trial, the district court judge denied the defendant's motion in limine, ruling that the religious belief evidence would be admitted to demonstrate the defendant's "motivation in sending the letter." During the voir dire, the district court judge pointedly and specifically advised the jury that "[t]here may be some evidence in this case regarding the religious views of the defendant. And the question is: if it appears that you hear evidence of that nature and the religious views of the defendant are different than your particular views, are there any members of the panel who would hold that against the defendant in this case?"

Two panel members responded that they held a bias or prejudice against the Unification Church and Reverend Moon, and the Court in its attempt to secure a completely antiseptic jury excused those two panel members from serving on that jury.

At trial, a handwriting expert with the Secret Service testified that he had compared the writing of the letter with a lease signed by Hoffman and a notebook of Hoffman's confiscated at the time of his arrest. The witness testified that, after comparing the exhibits with the threatening letter, he concluded Hoffman was the author of the threatening letter. The defendant's mother testified that her son was a member of a religious group headed by the Reverend Moon. When asked, "Did your son, David, express to you any concerns that he had involving President Reagan?" Mrs. Hoffman replied, "I think he was concerned about many things. One, that a religious leader had been imprisoned, and he thought that he's [Reverend Moon] highly principled, and he did not think this is right."

The defendant neither testified, nor presented any testimony, but his counsel argued to the jury that the government failed to prove beyond a reasonable doubt that he was the author of the threatening letter. The court's instructions to the jury included the following instruction as to the elements of the offense:

"Three essential elements are required to be proved in order to establish the offense charged in the indictment. First, that the defendant caused a letter to be mailed that contained a threat to take the life or to inflict bodily harm upon the President of the United States.... Second, that the words contained in the letter constituted a true threat as defined in these instructions and understood as such. And, three, that the defendant acted knowingly and willfully.

\*       \*       \*       \*       \*       \*

The prosecution, that is, the government, must establish a true threat, which means a serious threat as distinguished from words uttered as mere political ar-

gument, idle talk, or jest. In determining whether words were uttered as a threat, the context in which they were spoken must be considered. A threat is knowingly made if the maker of it comprehends the meaning of the words uttered by him. And a threat is willfully made if in addition to comprehending his words the maker voluntarily and intelligently utters the words as a declaration of an apparent determination to carry out the threat. Before you can convict the defendant under the statute, you must be convinced beyond a reasonable doubt that the defendant intentionally made the written statement with which he is charged in the context and under such circumstances that a reasonable person would foresee that the statement would be interpreted by persons hearing or reading it as a serious expression of an intention to inflict bodily harm upon or to take the life of the President of the United States. And you must be further convinced beyond a reasonable doubt that the statement was not the result of mistake, duress, or coercion."

After the jury returned a verdict of guilty against Hoffman, the district judge sentenced Hoffman to four years imprisonment pursuant to 18 U.S.C. sec. 4205(b)(2) and recommended that Hoffman be committed to the federal psychiatric facility at Springfield, Missouri where he could receive psychiatric treatment. The court ordered, received and reviewed a pre-sentence report from the Probation Department which is a part of this record.[1] The Probation Department reported that Hoffman had been hospitalized in psychiatric institutions on several occasions and in fact had been arrested in a McDonald's restaurant in Milwaukee, Wisconsin, in October 1980 with a revolver under his coat, and as late as May 1985, had assaulted a woman on the University of Wisconsin, Milwaukee campus, while out on bond on this sec. 871 charge.

## II.

### A. *Elements of the Offense*

18 U.S.C. sec. 871(a) prohibits any person from "knowingly and willfully ... [making] any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States...." In *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Supreme Court cautioned that because the statute "makes criminal a form of pure speech, [it] must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Id.* at 707, 89 S.Ct. at 1401. The court construed the statute "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 708, 89 S.Ct. at 1401. To protect these First Amendment values, the Court held that "the statute initially requires the government to prove a true 'threat.'" *Id.* The Court concluded that "political hyperbole" does not constitute a "true threat." *Id.*

In determining what constitutes a "true threat," we are called upon to consider the clear language and the dual purposes of the statute. A threat upon the President's life may very well have a detrimental effect upon his activities or movements regardless of whether the person making the threat actually intends to assault the president. Therefore, the courts have ruled, many of them relying on Justice Marshall's concurring opinion in *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), that Congress intended sec. 871 to prohibit any statement that would disrupt the activities and movements of the president. As Justice Marshall noted in his concurring opinion in *Rogers:*

---

**1.** Contrary to the assertion of the dissent at 722, we do not use any of the facts contained in the presentence report to support our affirmance of Hoffman's conviction.

"Plainly, threats may be costly and dangerous to society in a variety of ways, even when their authors have no intention whatever of carrying them out. Like a threat to blow up a building, a serious threat on the President's life is enormously disruptive and involves substantial cost to the government. A threat made with no present intention of carrying it out may still restrict the President's movements and require a reaction from those charged with protecting the President."

*Id.* at 46–47, 95 S.Ct. at 2098 (Marshall, J., concurring). To interpret the statute any other way would, in effect, preclude those charged with the safety of the President from protecting the President until that very moment when the President finds himself staring down the barrel of a loaded gun. Thus, Congress did not intend that sec. 871 limit a citizen's right to speak freely, *Watts,* nor did it intend to unduly restrict the ability of those charged with protecting the President from effectively carrying out their responsibilities.

■ Thus, in order for the government to establish a "true threat" it must demonstrate that the defendant made a statement

"in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President."

*Roy v. United States,* 416 F.2d 874, 877 (9th Cir.1969). Contrary to the dissent's interpretation of case law, the government is not required to establish that the defendant actually intended to carry out the threat. As the Second Circuit noted, "it is the utterance which the statute makes criminal, not the specific intent to carry out the threat...." *United States v. Kelner,* 534 F.2d 1020, 1025 (2nd Cir.1976). Thus, Justice Marshall asserted

"Because sec. 871 was intended to prevent not simply attempts on the President's life, but also the harm associated with the threat itself, I believe that the statute should be construed to proscribe all threats that the speaker intends to be interpreted as expressions of an intent to kill or injure the President.

\*    \*    \*    \*    ·  \*        \*

I would therefore interpret sec. 871 to require proof that the speaker intended his statement to be taken as a threat, even if he had no intention of actually carrying it out."

*Rogers,* 422 U.S. at 47, 48, 95 S.Ct. at 2098, 2099. *See also United States v. Carrier,* 708 F.2d 77, 79 (2nd Cir.1983) (there was sufficient evidence to support a conviction under Sec. 871 where evidence entitled the jury to infer that the defendant intended that her statements be understood by others as a serious threat to the President); *United States v. Callahan,* 702 F.2d 964 (11th Cir.1983) (to establish violation of sec. 871 the government must prove that the defendant "understood the meaning of the words to be an apparent threat"); *United States v. Compton,* 428 F.2d 18 (2nd Cir. 1970) (approved the following jury instruction: "[a]lthough for a finding of guilt it is not necessary for you to find that the defendant actually intended to carry out the threat, it is necessary for you to find that he intended to make the threat and actually made the threat knowingly and wilfully"); *United States v. Hart,* 457 F.2d 1087 (10th Cir.), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972) ("we do not believe that the wilfulness element requires that the defendant actually intends to carry out the threat").

■ The dissent construes the cases which have addressed the question of what constitutes a "true threat" under Sec. 871 and adds another element to the proof that the government must establish to convict under Sec. 871. The dissent in adding another element reads the cases it cites at pages 718–19 as establishing a requirement that a "true threat" can only be proven where evidence is available that "corroborates" the intent of the defendant to make a "true threat." The dissent would require that the government establish that the de-

fendant had the ability to carry out the threat. However, corroborating evidence that the defendant had the ability to carry out the threat is not a requirement to establish a "true threat" under § 871. In *United States v. Melendy*, 438 F.2d 531 (9th Cir.1971), the court upheld the conviction of the defendant under § 871 where the defendant was incarcerated in prison when he made the threat and thus hardly capable of carrying out his threat. ("The defendant, incarcerated ... did not have much capacity to carry out his threat, but the threat is the crime." *Id.* at 532). The corroborating evidence the dissent believes was present in the cases it cites merely established that the defendant had the present ability to carry out the threat. But as we have already noted, the government is not required to prove under § 871 that the defendant actually intended to execute the threat. Further, the dissent overlooks the standard of review we must apply to the jury verdict here. The question we must answer is not whether *we* would have convicted the defendant on the basis of the evidence introduced at trial, but rather, whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). And in so doing, we view the evidence in the light most favorable to the prosecution. *Id.* Accordingly, we review the evidentiary errors Hoffman alleged in light of the government's burden of establishing a "true threat" by demonstrating that Hoffman intended the statement "Ronnie, Listen Chump! Resign or You'll Get Your Brains Blown Out," together with the drawing of the gun and the bullet being ejected therefrom to be taken as a true threat.

### B. *The Evidentiary Question*

Fed.R.Evid. 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Contrary to the apparent viewpoint of the dissenter we may find error in a court's evidentiary decisions only if the "court clearly abused its discretion" in admitting the evidence. *United States v. Rovetuso*, 768 F.2d 809, 815 (7th Cir.1985) ("A district court has broad authority to control the admission of evidence....") In a prosecution under sec. 871(a), the trier of fact may consider all relevant facts concerning the defendant's knowledge and intent in making an allegedly threatening statement concerning the President. *United States v. Frederickson*, 601 F.2d 1358 (8th Cir.), *cert. denied*, 444 U.S. 934, 100 S.Ct. 281, 62 L.Ed.2d 193 (1979). The defendant contends that the district court improperly admitted evidence of his religious affiliation with the Reverend Sun Yung Moon. The defendant argues that such evidence was not probative of his intent to threaten the President and therefore the prejudicial effect of such evidence, which the defendant alleges arises from the fact that "many Americans look askance on their fellow citizens who join such cult style eastern religions," substantially outweighed any probative value such evidence may have had. We hold the defendant's argument to be without merit because: (1) the evidence as to Hoffman's religious affiliation established a possible motive for his sending the letter which was probative of whether Hoffman intended the letter to constitute a "true threat", and (2) any possible prejudice that might have resulted from such evidence was effectively eliminated by the district court's thorough and exhaustive voir dire and the court's excusing of two jurors who might have been prejudiced against the defendant because of his religious affiliation.

The district court record reveals that the evidence concerning Hoffman's religious beliefs was introduced to establish "the context of the statement (the letter) and the wilfulness of the defendant in making

it." [2] Contrary to the assertion of the dissent, the government did not rely solely on the defendant's affiliation with Reverend Moon to establish the intent of Hoffman to threaten the President. The government introduced additional evidence dealing with Hoffman's dissatisfaction with the continued confinement of Reverend Moon. The government established this fact through testimony from Hoffman's mother, thus allowing the jury to reject or infer that Hoffman might very well have had a motive in threatening the President. The law is eminently clear that the court *may* receive evidence as to the defendant's motive. As the Fifth Circuit held in *Reid v. United States,* 136 F.2d 476, *cert. denied,* 320 U.S. 775, 64 S.Ct. 87, 88 L.Ed. 465 (1943), where the government introduced evidence as to previous pro-German statements of the defendant: "[e]vidence as to appellant's pro-German attitude was relevant to the issue as to whether the statements against the President were knowingly and willfully made, and was admissible." *Id.*[3] *See also United States v. Patillo,* 438 F.2d 13, 16 (4th Cir.1971) (in prosecution under § 871 "trier of fact may ... consider all relevant facts concerning the background of the defendant, his motives, the manner in which the threat was made, and the reaction of those who heard the threat and thus have an opportunity to form an opinion about

the speaker's present intention to injure the President of the United States.") Proof of motive is not required of the government under sec. 871, and is nothing more than an evidentiary aid to the jury in its fact-finding process of rendering a verdict of guilt or innocence. Evidence of Hoffman's motive is probative of Hoffman's intent that his (Hoffman's) letter in fact constituted a "true threat" in the eyes of those who received the letter. Hoffman's mother testified that "I think he (Hoffman) was concerned about many things. One, that a religious leader had been imprisoned, and he thought that he's (Reverend Moon) highly principled, and he did not think this is right." Hoffman's mother further testified that Hoffman believed that the Reverend Moon should have been pardoned by the President and released from confinement. Obviously since Hoffman believed that Reverend Moon was wrongly imprisoned, and President Reagan could have pardoned him and thus was responsible for Moon's continued imprisonment, he had a motive to harm the President: retaliation. The question of whether Hoffman had a motive to harm the President was presented to the jury with evidence from which they could reasonably accept or reject the inference that the defendant intended his threat to be taken as a serious threat to retaliate against the

**2.** The dissent would have us believe that the trial court admitted the religious affiliation evidence simply on the assertion. of the district attorney that such evidence was admissible. A reading of the record reveals that this assertion is false for the district court had before it a detailed discussion of the government's position on the admissibility of the religious affiliation evidence which was contained in the response to the defendant's motions in limine the government filed. Further, the trial court considered the defendant's claim that the evidence of his prior affiliation with the Unification Church was unduly prejudicial:

"THE COURT: I know it's in here some place. This file is getting rather large. I might save a little time here. I think essentially the defendant's objection to that line of evidence is really a 403 objection, and its probative value is outweighed by the prejudicial effect that that evidence might have. And that's a matter that's committed to my discretion."

Thus, it is evident from the record that the trial court admitted the religious affiliation evidence on grounds other than the district attorney's assertion that the evidence was admissible.

**3.** The testimony at trial in *Reid* concerned statements that Reid had made to the effect that he was "a good friend of former German Consul Von Speigel" and that "Germany would win the war and that we would be subject to Hitler's rule." 49 F.Supp. 313, 316 (D.C.W.La.1943). Reid was convicted in January of 1943, while the United States was engaged in war with Germany. We can hardly imagine a time at which inflammatory pro-German statements like those attributed to the defendant in *Reid* would be more likely to prejudice a defendant than during a period when anti-German sentiment was rampant throughout the country. Yet, even under these circumstances, the court considered the evidence was properly admitted to establish the seriousness of the statement the defendant made against the President.

government (the President) for Reverend Moon's continued confinement. The jury could reasonably conclude that Hoffman intended the violent language and the graphic drawing he used in his letter to the President as a serious expression of a true threat to inflict harm upon the President. We hold that the probative value of the evidence of Hoffman's prior religious affiliation was not substantially outweighed by its alleged prejudicial impact and thus it was properly admitted in evidence.

■ The defendant argues that because "many Americans look askance on their fellow citizens who join such cult style eastern religions," the evidence of his prior affiliation with Reverend Moon would likely cause a jury to "treat a defendant it knew to be a Reverend Moon follower much more unfairly than it would a defendant whose religion was not known to the jury or whose religion was known to be a mainline one, such as Protestantism or Catholicism." Therefore, the defendant asserts that the prejudicial effect of the evidence concerning his affiliation with Reverend Moon substantially outweighed any probative value such evidence had. Not only is the defendant's unsupported assertion purely speculative, but it is without merit when viewing the *entire* record of the district court's meticulous, thorough, clear, and concise questioning of potential jurors about their religious beliefs and prejudices. The court included in its voir dire the very question defendant's counsel had proposed for eliciting possible prejudice of the prospective jurors: "Does anyone here have any bias or prejudice against the Unification Church or the Reverend Sun Yung Moon, and would that bias or prejudice prevent you from judging the facts in this case fairly and objectively?" The district court's voir dire also advised the jury that:

"[t]here may be some evidence in this case regarding the religious views of the defendant. And the question is: if it appears that you hear evidence of that nature and the religious views of the defendant are different than your particular views, are there any members of the panel who would hold that against the defendant in this case?"

The district court dismissed two jurors who expressed a potential bias or prejudice against Reverend Moon's Unification Church. As a result of the court's thorough review, evaluation and action in discharging those jurors who had even a possible taint of prejudice or bias, we do not agree that the jurors on the Hoffman panel were prejudiced against Hoffman because of his religious affiliations and we have discovered no evidence in the record to establish otherwise. The dissent, in asserting the contrary, gropes at thin air with a specious argument based upon unpersuasive reasoning. The fact that the defendant was a member of what the dissent refers to as a "religious minority" alone does not give rise to the presumption that jurors of different religious affiliations would treat that defendant differently than they would treat any other defendant. This is especially true where, as in this case, the trial judge did all that could be expected of him to insure that the panel of jurors assigned to the defendant's case did not harbor feelings based on the religious affiliations of the defendant that would preclude them from deciding the defendant's guilt or innocence on the basis only of their fair evaluation of the evidence presented at trial and the law applicable as given in the instructions. The jurors were questioned by the district court under oath and the record provides no evidence to rebut the presumption that the jurors, having taken their oath, honestly and conscientiously responded to the court's questions concerning their religious views vis-a-vis those of the defendant. Therefore, after a review of the record, we hold that the probative value of the evidence concerning the defendant's prior affiliation with the Reverend Moon was not substantially outweighed by the alleged prejudicial effect of such evidence and the defendant's assertion that the jury was prejudiced against

him was purely speculative and unsupported.[4]

## C. *Substantial Evidence*

A criminal verdict must stand if, after viewing the evidence in the light most favorable to the government, there is substantial evidence to support the verdict. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The prosecution's case need not "answer *all* questions and remove *all* doubts ... because that would be impossible; the proof need only satisfy reasonable doubt." *United States v. Bush,* 749 F.2d 1227, 1234 (7th Cir.1984) (Coffey, J., concurring) (*quoting Borum v. United States,* 380 F.2d 595, 599 (Burger, J., dissenting) (emphasis in original). A hypertechnical analysis requiring the prosecution to answer all questions and remove all doubts "conflicts with the well-settled rule that a jury verdict must be sustained if 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Bush,* 749 F.2d at 1234 *quoting United States v. Moya,* 721 F.2d 606, 609 (7th Cir.1983). To establish a violation of sec. 871(a), the Government must establish that the defendant "knowingly and willfully [made] a threat to take the life of, or kidnap, or to inflict bodily harm upon the President of the United States...." The Government also had to demonstrate that the letter sent to the President contained a "true threat" to his life. The dissent asserts that the conditional nature of Hoffman's statement in the letter he sent to the President evidences the absence of any present intent to carry out the threat, and thereby precludes this court from holding that the statement constitutes a true threat: "Hoffman's statement is expressly conditioned on an event outside his control ... and suggests that the author did not intend to act upon it." Dissent at 720. According to the dissent, the letter "states a mere prediction ... that if the President does not resign, he will get his brains blown out." Dissent at 720. We disagree with the dissent for two reasons. A logical reading of the cases construing sec. 871 clearly establishes that the conditional nature of a statement does not make the statement any less of a "true threat" simply because a contingency may be involved. *See United States v. Welch,* 745 F.2d 614, 618 (10th Cir.1984); *United States v. Moncrief,* 462 F.2d 762 (9th Cir. 1972); *United States v. Jasick,* 252 F. 931 (D.C.Mich.1918).[5] The trial court judge properly instructed the jury:

4. The dissent carelessly contends that the trial court rejected the defendant's requested limiting instruction on the prejudicial impact of the religious-affiliation evidence. A careful reading of the record, however, reveals that the trial court instructed the jury precisely as the defendant requested, omitting only that part of the suggested instruction that counsel, by presenting it in brackets, himself suggested was optional. The instruction proposed by Hoffman's counsel reads:

"... You are to disregard any evidence to which I sustain an objection or which I ordered stricken. Anything you may have seen or heard about this case outside the courtroom is not evidence and must be entirely disregarded. You should not be influenced by sympathy, prejudice, fear or public opinion. [You should not be influenced by any person's race, color, religion, national ancestry, or sex.]"

The district court instructed the jury:

"... Discuss, if you have differences in this case, with an open mind. Continue your deliberations. Do not be swayed by any sympathy, any passion or any prejudice in this case

for or against any of the parties. And let your verdict in this case speak the truth, whatever the truth may be."

Tr. 197.

5. Indeed, a threat by its very nature and language is a prediction of impending harm to the target of the threat. "An expression of an intention to inflict pain, injury, evil, or punishment, ... an indication of impending danger or harm." American Heritage Dictionary 1265 (2d College Ed. 1976). According to the reasoning of the dissent, the statement "I will kill you" made directly to the President would not constitute a "true threat" because it is merely a prediction—a prediction that the speaker at some future point (maybe a matter of seconds) will take the life of the President; in other words, the dissent would construe the words "I will kill you" as a prediction that in the future, the President will be killed. The speaker, according to the reasoning of the dissent, is "undistinguishable" from the "psychic" that predicts the death of the President in a particular year. We predict that were we to adopt the dissent's interpretation of Hoffman's statement, the govern-

"Before you can convict the defendant under this statute, you must be convinced beyond a reasonable doubt that the defendant intentionally made the written statement with which he is charged in a context and under such circumstances that a reasonable person would foresee that the statement would be interpreted by persons hearing or reading it as a serious expression of an intention to inflict bodily harm upon or to take the life of the President of the United States."

■ The government clearly established through the indentation procedure and the government agent's handwriting analysis that Hoffman was the author of the letter. The defendant neither testified at trial nor produced any evidence to controvert the government's evidence concerning the authorship of the letter issue, nor does Hoffman argue it on appeal. The defendant does not contest that he intended that the threatening letter reach the President as written. Thus, the only question presented is whether the government produced evidence sufficient to support the jury's verdict that Hoffman's letter constituted a "true threat." The defendant alleges that the government did not present sufficient evidence to support his conviction.

The clear and unambiguous statement "Ronnie, Listen Chump! Resign or You'll Get Your Brains Blown Out," together with the drawing of a gun with a bullet emerging, on its face constitutes a clear and unambiguous threatening statement that one "would reasonably expect to be taken seriously" by those who received the letter in the White House mail room. As the Supreme Court noted in *Watts*, the reaction a statement generates in those to whom it is communicated is one of the appropriate factors to be considered in assessing whether the author intended his statement to constitute a true threat. *See Watts*, 394 U.S. at 708, 89 S.Ct. at 1401. In this case, a White House mail-room employee, upon opening Hoffman's letter and

reading it, immediately sent it to the Secret Service, the governmental agency responsible for presidential security. The immediate response of the mail-room employee and the Secret Service to the content of Hoffman's letter is clear evidence of the seriousness the recipients of the letter attached to the expression of the intent to harm the President. The jury was certainly entitled to take these facts into consideration in determining whether or not the defendant intended a serious or true threat.

The defendant in effect admitted he intended a true threat in his statement after his arrest stating that "he didn't know it was *against the law to threaten* the President" (emphasis added). Although this is a clear admission that he did not know a threat against the President was a violation of the law, the content of the statement makes it clear that he intended his statement to be a true or accurate expression of his clear and unambiguous intent to harm the president. Hoffman also took a deliberate number of steps to ensure that the threat would be communicated to the President, clearly distinguishing Hoffman's letter from the "political hyperbole" that the Supreme Court in *Watts* held would not establish the "true threat" requirement of sec. 871. Hoffman took seven conscious steps to communicate his threat: (1) initially he conceived and planned the mode of the threat; (2) inscribed it on paper; (3) placed the manuscript and drawing in an envelope; (4) moistened and sealed the envelope; (5) addressed the envelope; (6) placed a stamp upon the envelope; and (7) deposited it in the United States mail. He was fully able to interrupt and stop the process at any time before finally depositing the threatening letter in the mail. In view of these conscious acts, it was reasonable for the jury to conclude that Hoffman intended the letter as a serious expression of his intent to harm the President. All of these facts, when considered in their entirety, including the defendant's probable motive for sending the letter to the Presi-

ment would find it impossible to establish a "true threat" under sec. 871 no matter how

unambiguous or direct the statement the government contends constitutes a threat.

dent—retaliation for the continued imprisonment of the Reverend Moon (discussed above), and the President's failure to pardon Moon—provide substantial evidence to support the jury's conviction of the defendant Hoffman for violating sec. 871. Indeed, the jury sent out a clear message to their fellow citizens that they do not wish to live in an assault-crime-ridden and terror-stricken society, that they want to do their part in giving protection to their fellow man, and thus were demonstrating their approval of an immediate end to the senseless assaults on political leaders such as Gerald Ford, Ronald Reagan, and George Wallace, and the vicious murders of John and Robert Kennedy and Martin Luther King, all of whom to the best of our knowledge were never fortunate enough to have received a prior warning from their slayers.

### III. *Excessive Sentence*

■ The defendant also contends on appeal that the district court abused its discretion in sentencing Hoffman to four years confinement on his conviction for threatening the life of the President. This Court "may not change or reduce a sentence imposed within the applicable statutory limits on the ground that the sentence was too severe unless the trial court relied on improper or unreliable information in exercising its discretion or failed to exercise any discretion at all in imposing the sentence."[6] *United States v. Fleming*, 671 F.2d 1002, 1003 (7th Cir.1982). *Accord, United States v. Ely*, 719 F.2d 902, 906 (7th Cir.1983); *United States v. Schmidt*, 760 F.2d 828, 833 (7th Cir.1985). Hoffman argues that the sentence was excessive because 1) Congress did not intend that a defendant "whose act was nothing more than a technical violation" of sec. 871 "to receive a sentence one year shy of the maximum;" 2) the government only requested a sentence of one year, and 3) the defendant had only a relatively minor criminal record, and as the district court noted, "appeared to be the kind of person who can function properly, probably 90 per cent of the time."

The defendant in alleging that his four-year sentence is excessive fails to raise any logical, much less legal, grounds that would justify this court in considering a reduction in the sentence imposed by the trial court. The defendant does not contend that the district court considered improper or unreliable information nor does Hoffman contend that the district court failed to exercise any discretion in determining the term of confinement for Hoffman. A review of the record reveals that the district court went out of its way to accommodate the special needs of this defendant. The court sentenced Hoffman under 18 U.S.C. sec. 4205(b)(2) because it provided the greatest amount of flexibility for the rehabilitation of Hoffman. Under sec. 4205(b)(2), there is no minimum term that must be served, the defendant is eligible for parole at any time, and the defendant can also be assigned to a medical facility for treatment. The district court ruled at sentencing that Hoffman was "an intelligent, bright man" who had serious problems he needed to work out in order to conform his conduct to accepted norms. The district court explained:

"I think your judgment is questionable. Maybe not all the time, certainly

---

6. Although not yet in effect, the new standard of review for sentences provides that:

"Upon review of the record, the court of appeals shall determine whether the sentence—
(1) was imposed in violation of law;
(2) was imposed as a result of an incorrect application of the sentencing guidelines; or
(3) is outside the range of the applicable sentencing guideline, and is unreasonable, having regard for—

(A) the factors to be considered in imposing a sentence, as set forth in chapter 227 of this title; and
(B) the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c)."

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous.

18 U.S.C. Sec. 3742(d) (effective November 1, 1986).

not all the time. But a certain percentage of the time, your judgment is going to be so questionable that you become a dangerous person.... I don't know, and I question whether or not right now, Mr. Hoffmann [sic] have the level of internal controls that are necessary to conform your conduct to the requirements of the law all the time, not just 80 or 90 percent of the time."

Tr. at 25, 26. The district court also stated:

"I don't think that a one-year commitment to prison would do anything here. Because I don't think ... there's any assurance that Mr. Hoffmann [sic] is going to be in any better condition to handle himself after such a short period of incarceration."

Tr. at 24. Thus the district court sentenced Hoffman to a term of four years in order to provide "extended control, if that appears to be necessary here." Tr. at 27.

The district court's consideration of Hoffman's prior criminal record and mental health problems, as well as the flexible terms of a sentence under sec. 4205(b)(2) was an exercise of discretion based on proper and reliable information. The district court carefully weighed these factors and clearly articulated and fashioned a sentence that accommodated the special needs of the defendant Hoffman. Based on the record, we hold that the district court did not abuse its discretion in imposing a four-year sentence on Hoffman; and therefore, we affirm the district court's sentence.

### IV.

The jury's conviction of the defendant David Hoffman of violating sec. 871 for threatening to take the life of the President of the United States and the district court's four-year sentence are affirmed.[7]

WILL, Senior District Judge, dissenting.

David L. Hoffman was prosecuted under 18 U.S.C. § 871(a) for sending a letter,

reproduced below, to the President of the United States:

At trial, over the defendant's objection, the government was permitted to introduce evidence of Hoffman's prior religious affiliation and his political views. Hoffman's mother testified that Hoffman had formerly been a member of the religious sect headed by the Reverend Sun Myung Moon and that he was "concerned" about Moon's imprisonment on charges of tax evasion. Based on this testimony plus evidence that Hoffman authored the letter, but without any evidence that he contemplated any action other than writing and sending the letter, a jury convicted him of the offense charged.

In this case we are called upon to strike the delicate balance between the right to express opposition or even vehement disagreement with governmental leaders and the necessity for protecting the President and maintaining political order. The majority opinion, in my view, fails to achieve this balance. To my mind, Hoffman's mother's testimony as to his religious and political opinions was irrelevant and highly prejudicial. Even with this evidence, however,

---

**7.** We also deny appellant's motion to dismiss his appeal for failure to comply with Circuit Rule 7(d). Appellant's motion to dismiss was made without consultation of counsel as is required by Circuit Rule 7(d).

the government failed to prove that Hoffman's letter constituted a "true threat" against the life of the President. *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Because the majority opinion shows insufficient regard for Hoffman's first amendment rights of religious liberty and freedom of expression, I dissent.

## I.

The majority assumes, without explanation, that evidence of Hoffman's affiliation with the Moon sect meets the threshold requirement of relevance. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.

Acknowledging that the letter standing alone would be insufficient to demonstrate a "true threat," the prosecution sought to introduce evidence of Hoffman's religious and political views.[1] Hoffman filed a motion in limine to exclude this evidence. The district court denied Hoffman's motion without holding a hearing or receiving a proffer of the government's proof, apparently relying on an erroneous representation by the prosecution that the evidence would show Hoffman wrote the letter in anger.

Hoffman's mother took the stand at trial and testified that her son had once been a follower of the Reverend Moon. Though Hoffman had been "concerned" about Moon's imprisonment, she said, she did not know "how adamant he felt about it." Her conversations with Hoffman about Moon arose in the course of "normal discussions" between mother and son. When asked whether Hoffman believed that the President should take any specific action, Mrs. Hoffman replied, "We felt that he probably should have been pardoned." She denied that Hoffman ever threatened or expressed to her an intention to harm the President.

Viewing this evidence in light of the definition of relevance and the majority's own test for a "true threat," I fail to see any legitimate purpose to which the jury could have put it. Surely, the evidence cannot be said to increase the probability that Hoffman intended the letter—which did not even refer to Moon—to be perceived as threatening. At best, it establishes that Hoffman disagreed with President Reagan on a single issue. This fact, it should be noted, fails to distinguish Hoffman from a very significant portion of the population, including members of such organizations as the Democratic Party, Common Cause, Public Citizen, the ADL, trade unions, women's rights, environmental protection, civil liberties, farmers, anti-nuclear warfare, pro-choice, etc., all of which disagree with the President on one or more issues. I trust the majority does not intend its holding here to suggest that such affiliations would be admissible in a similar case.

It is true that, in a controversial case, Reverend Moon was convicted of tax evasion and sentenced to federal prison. *See United States v. Moon*, 718 F.2d 1210 (2d Cir.1983) (affirming conviction), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). It is also true that the President has the power to pardon federal prisoners, U.S. Const. Art. II, § 2, and that Hoffman—and his mother—would have liked to see the President exercise this power in Moon's favor. But the test for relevance obviously requires more than that the evidence sought to be introduced coexist in time and space with the subject matter of the case. If there were evidence that followers of Moon have a propensity to engage in acts of violence (there was none), or that Hoffman himself was violently enraged by the President's refusal to pardon Moon (his mother testified merely that he was "concerned"), or if the letter itself contained some reference to Reverend Moon or his imprisonment (it did not),

---

1. In its response to the defendant's motion in limine, the government stated that "This information is critical to an understanding of the context of the statement, and of the willfulness of defendant in making it."

then the evidence of Hoffman's religious and political beliefs might have had some probative value. But in the absence of any such evidence, the jury should not have been permitted to speculate either that there was a link between the letter and the disagreement over Moon's treatment, or that Hoffman contemplated doing anything more than simply writing the letter.

## II.

Even if the evidence had been relevant, Rule 403 would require that it be excluded if its probative value were "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. The majority scoffs at Hoffman's counsel's suggestion that "many Americans look askance on their fellow citizens who join such cult style eastern religions," stating that this assertion is "purely speculative." *Ante*, at 710. Though I disagree with the majority's statement, I prefer not to engage in a debate over whether Americans in fact have a tendency to shun or look down on particular religious minorities. Instead, I will simply point out that our law traditionally has recognized the potential for prejudice inherent in evidence of one's religious affiliation or beliefs. *See, e.g.*, McCormick, *Evidence* § 48 (1954) ("the disclosure of atheism or agnosticism, or of affiliation with some strange or unpopular sect, will often in many communities be fraught with intense prejudice"); Fed.R.Evid. 610 (evidence of religious beliefs not admissible to impeach or bolster witness' credibility).

Religion is a highly emotional issue with a natural tendency to play upon a jury's passions. Absent some compelling reason, evidence of a criminal defendant's religion should not be admissible against him on the issue of guilt or innocence.

No compelling reason for admitting evidence of Hoffman's prior religious affiliation was offered in this case. Indeed, the trial court, as mentioned earlier, did not even have before it an offer of proof of Mrs. Hoffman's testimony when it denied Hoffman's motion to exclude the evidence. Rather, the court had only the government's representation that the evidence would show that Hoffman wrote the letter out of "anger" with the President for his failure to pardon Moon. As it turned out, the government was unable to elicit any such testimony. Hoffman's mother stated merely that he was "concerned," that she did not know how "adamant" he felt about the matter, that he never threatened or expressed an intention to threaten the President, that the topic arose in the course of ordinary discussions between mother and son, and that she and her son *both* felt that Moon "probably should have been pardoned." Thus, the trial court's ruling was based on erroneous representations by the prosecution as to what the evidence would show.

This result could have been avoided had the trial court held a hearing on the motion in limine and required the government to disclose its evidence in advance of trial so that its relevance and probative value could have been weighed against its potential prejudice. Instead, the court simply accepted the government's representations, stating that it would "assum[e] the good faith of the U.S. Attorney ... as to why that evidence is admissible." Assumed good faith of counsel, however, is not an appropriate yardstick by which to measure the admissibility of evidence. The duty of an advocate is to advance the interests of his client. It is the judge's duty to ascertain the purpose and relevance of proffered evidence and to rule on its admissibility.

Twenty-five years ago a wise and experienced trial judge, advising me on my new responsibilities as a district judge, told me: "Don't rely on the Assistant United States Attorneys to protect you from admitting improper evidence and committing reversible error. They are understandably as anxious to win as other counsel and will attempt to introduce evidence they believe will help them even if its admissibility is questionable. Frequently, the fact that it's prejudicial is the very reason they offer it. You will have to decide whether or not it is relevant and, even if it is, whether or not its potential prejudice outweighs its proba-

tive value." Through the years, I have found that to be sound advice. If the trial judge here had held a preliminary hearing, he would have ascertained that the evidence was not as condemning as the government had represented it would be, that it was being offered not simply to show a possible motive for a "true threat" but to establish that the communication *was* a "true threat," and that there was no extrinsic evidence of an apparent determination by Hoffman to harm the President or do anything but write the letter. Under these circumstances, I trust he would have sustained the defense's objection to the evidence.

The majority, in contrast, at least attempts to give reasons for admitting the testimony, but I find its reasons no more persuasive. The majority views the evidence as establishing that Hoffman had a "motive" to harm the President. This is a possible but highly speculative inference. Virtually none of the many people who disagree with the President, including Moon's followers, intends to harm him. In any event, the majority concedes, as it must, that motive is not an element of a § 871(a) offense. *Ante,* at 709. Faced with this paradox, it proceeds, heroically, to reason that proof of motive was "nothing more than an evidentiary aid to the jury in its fact-finding process of rendering a verdict of guilt or innocence." *Id.* I read this statement as an acknowledgement that irrelevant evidence was admitted, assisting the jury to render a verdict of guilty.

The evidence that Hoffman was a former Moonie who opposed the imprisonment of Reverend Moon had the effect of "casting him in the eyes of the jury as a member of a group with values allegedly alien to the rest of society ... implying that it was more likely that he committed the crime charged." *Pennsylvania v. Tirado,* 473 Pa. 468, 375 A.2d 336 (Pa.1977). Absent some compelling reason for placing this evidence before the jury, the district court's refusal to exclude it constitutes an abuse of discretion.

## III.

As an additional reason for rejecting Hoffman's claim of prejudice, the court relies on the fact that jurors were asked during voir dire whether they held any bias against Reverend Moon or the Unification Church. Hoffman's claim of prejudice, the court writes, "is without merit when viewing the *entire* record of the district court's meticulous, thorough, clear and concise questioning of potential jurors about their religious beliefs and prejudices." *Ante,* at 710.

This holding represents, to my mind, a drastic change in the rules of evidence. In measuring prejudice under Rule 403, we are now told, a court should consider whether jurors were questioned about their prejudices during voir dire. If they were, and they denied any prejudices, the court presumably need not entertain arguments to exclude potentially prejudicial evidence under Rule 403.

This new rule of evidence presents enormous opportunities for abuse. Clever advocates may now use voir dire to neutralize any objections their opponents may raise at trial based on Rule 403. The rule is also at odds with the traditionally limited role of voir dire in assuring a fair trial. Though an unfair voir dire may offend due process, *see, e.g., Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), there is much more to due process than a fair voir dire. The court's holding suggests that a fair voir dire may convert any subsequent evidentiary mistakes by the trial court into "harmless error."

An additional problem with the court's analysis is that it overlooks the well recognized fact that jurors may be unable or unwilling to identify and publicly declare their biases. The Supreme Court's observation of nearly eighty years ago remains true today: "Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one ... who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly

uninfluenced by anything but the evidence." *Crawford v. United States*, 212 U.S. 183, 196, 29 S.Ct. 260, 265, 53 L.Ed. 465 (1909); *see also Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961). Recognizing this principle, Hoffman's counsel moved to have prospective jurors separately questioned to promote candor in the voir dire. This motion, too, was denied.

Historically, at least, the question of whether the prejudicial impact of evidence outweighs its probative value has not been determined by what questions were asked at voir dire. Rather, Rule 403 has been understood to mandate an objective balancing process, including a pretrial hearing, if necessary, to determine precisely what the evidence will show. The fact that the jurors have denied that they would be prejudiced by particular evidence has never before, to my knowledge, entered into the balance. I earnestly hope that the majority opinion does not open the door to lawyers, particularly prosecutors, asking or seeking to have judges ask questions on voir dire about potentially prejudicial evidence such as prior criminal convictions, prior accidents, prior bankruptcy, or a host of other prejudicial matters. But I fear that such tactics are implicitly endorsed by the majority's unprecedented holding.

### IV.

Despite the obvious risk of prejudice attending the admission of the Moon evidence, the trial court gave no limiting instruction either at the time the evidence was introduced or later, when the jury was instructed. In fact, the trial court rejected Hoffman's proposed instruction that "You should not be influenced by any person's race, color, *religion*, national ancestry, or sex." (Emphasis added). Although a limiting instruction might not have cured the error of admitting the evidence of Hoffman's religious and political beliefs, it at least would have had the virtue of clarifying for the jurors what that evidence was *not* intended to prove. *Cf. United States v. Reme*, 738 F.2d 1156 (11th Cir.1984),

*cert. denied*, 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985). Instead, the jury was left free to follow its own prejudices and preconceptions and to speculate that such affiliation was evidence of a "true threat."

### V.

Perhaps even more critical than the erroneous admission of evidence as to Hoffman's prior religious affiliation was the prosecution's failure to demonstrate that this affiliation was probative of a "true threat." 18 U.S.C. § 871(a) (1982) subjects to criminal prosecution anyone who "knowingly and willfully deposits for conveyance in the mail ... any letter ... containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States." Notwithstanding the statute's broad language, the Supreme Court has made clear that not all threats on the President's life are prohibited by § 871.

In *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Court reversed the conviction of a man who was overheard during a public rally at the Washington Monument stating, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." While the Court found § 871 constitutional on its face, it warned that convictions under the statute could not be obtained without proof of a "true threat." Any lesser standard, the Court reasoned, would expose speakers to prosecution merely for exercising their first amendment rights:

> The language of the political arena ... is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was "a kind of very crude offensive method of stating a political opposition to the President." Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise.

*Id.* at 708, 89 S.Ct. at 1402.

Following *Watts*, the courts have developed various formulations to describe the

degree of mens rea the government must prove to establish a "true threat." *Compare United States v. Hart*, 457 F.2d 1087, 1090 (10th Cir.) (words must have been uttered as "declaration of an apparent determination to carry out the threat"), *cert. denied*, 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972), and *Roy v. United States*, 416 F.2d 874, 877–78 (9th Cir.1969) (words contain true threat if reasonable person would foresee that hearers would take statement seriously), *with United States v. Patillo*, 431 F.2d 293 (4th Cir. 1970), *panel opinion adhered to*, 438 F.2d 13, 15–16 (4th Cir.1971) (en banc) (speaker must have present intention to carry out threat, to incite others to carry out threat, or to disrupt presidential activities). *See also Rogers v. United States*, 422 U.S. 35, 46, 95 S.Ct. 2091, 2098, 45 L.Ed.2d 1 (Marshall, J., concurring) (government must prove that "defendant appreciated the threatening nature of his statement and intended at least to convey the impression that the threat was a serious one"). All courts, however, have held that the circumstances surrounding the making of the threat must be taken into account to determine whether the threat was a true threat.[2]

The circumstances found to be corroborative of a true threat have included: (1) special knowledge of the President's movements, *see, e.g., Roy v. United States*, 416 F.2d 874 (9th Cir.1969); (2) preparation of detailed schemes to carry out the threat,

see, e.g., *United States v. Hart*, 457 F.2d 1087 (10th Cir.), *cert. denied*, 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972); (3) post-arrest reaffirmation of intent to carry out the threat, *see, e.g., United States v. Vincent*, 681 F.2d 462 (6th Cir.1982); *United States v. Smith*, 670 F.2d 921 (10th Cir.1982); (4) ownership of or familiarity with guns or other weapons, *see, e.g., United States v. Carrier*, 708 F.2d 77 (2d Cir. 1983); and (5) a professed intent to travel to the vicinity of the intended victim, *see, e.g., United States v. Callahan*, 702 F.2d 964 (11th Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Frederickson*, 601 F.2d 1358 (8th Cir.), *cert. denied*, 444 U.S. 934, 100 S.Ct. 281, 62 L.Ed.2d 193 (1979).[3]

As previously indicated, none of the foregoing are present in this case. At trial, the government introduced no evidence that the defendant contemplated any action beyond writing the letter. There was no evidence that Hoffman was planning to travel to Washington, that he had formulated plans to assault the President, or that he owned the means to make good on a threat. Nor was there any evidence that any other member of the Moon sect had taken any action to threaten the President or that the sect believed or engaged in violence. Hoffman did not renew his threat upon arrest, but merely stated that he "didn't know it was against the law to threaten the Presi-

2. To rebut the assertion in text, the majority cites *United States v. Melendy*, 438 F.2d 531 (9th Cir.1971). *Melendy* is hardly a persuasive precedent. The opinion, an unsigned *per curiam*, consists of four sentences covering less than half a page in the West reporter. It contains no citation to *Watts* or any other case and no mention of the first amendment. Quoted in its entirety, the opinion reads as follows:

> The judgment of conviction for a threat on the life of the President of the United States is affirmed. 18 U.S.C. § 871.
> The defendant, incarcerated at Lompoc, California, did not have much capacity to carry out his threat, but the threat is the crime.
> The defense was that defendant did not have the requisite intent for the crime. That was a question of fact which he lost.

I confess that I did not take this wholly conclusory and unsatisfactory memorandum into ac-

count when I wrote that "All courts" since *Watts* have acknowledged the necessity of considering the circumstances surrounding the making of a threat.

3. The majority accuses me of applying an "actual intent" standard of proof. *Ante*, at 707. To the contrary, I rely solely on cases of those circuits that apply the less stringent "apparent determination" or "reasonable person" standards. Only the Fourth Circuit requires the government to prove a "present intention either to injure the President, or incite others to injure him, or to restrict his movements." *United States v. Patillo*, 438 F.2d 13, 16 (4th Cir.1971) (en banc). My analysis does not draw upon the cases from that circuit, however. Ironically, it is the majority that relies on *Patillo*. *Ante*, at 709.

dent." [4]   As the Assistant United States Attorney acknowledged at the sentencing hearing:

[T]he evidence at trial did not show that Mr. Hoffman made any effort to actually bring his threat to fruition.  And I'm not aware, as I sit in court today, of any actions on his part to, for example, acquire a firearm, place himself in the vicinity of the President, or do any of these other actions which would indicate an immediate and present plan on his part to actually act on the threat that he made.

So we're talking strictly here about the message that was sent by him to the White House.

The majority attempts to manufacture an elaborate scheme from the commonplace mechanics of writing and mailing a letter.  According to the majority, Hoffman engaged in "seven conscious steps" to communicate his threat: he conceived it, wrote it, placed the "manuscript" in an envelope, "moistened and sealed" the envelope, addressed the envelope, placed a stamp on the envelope, and deposited the envelope and its contents in a mailbox.  *Ante*, at 712–13.  Breaking down a single simple activity into its component parts, however, does nothing to amplify its severity.  It merely highlights the lack of real evidence of a "true threat."

Equally misguided is the majority's reliance on the fact that the mail room employee who opened Hoffman's letter saw fit to forward it to the Secret Service.  The court's analysis is based on a misreading of *Watts*, which found that, in determining the context in which the defendant's statement was made, it was appropriate to consider his listeners' response.  (They laughed).  *Watts*, 394 U.S. at 708, 89 S.Ct. at 1401.  From the reaction of Watts' listeners, the Supreme Court inferred that the defendant was engaging in political hyperbole, not making a true threat.  By contrast, no inference can be drawn from the reaction of a White House mail room employee or the members of the Secret Service, who are trained to react to and investigate anything possibly suspicious, including something that may be completely innocent and harmless, such as a gift package sent to the White House.  *See* Finer, *Mens Rea, The First Amendment, and Threats Against the Life of the President*, 18 Ariz. L.Rev. 863, 868 n. 27 (1976).  Significantly, the *Watts* Court gave no weight to the fact that *police* and *prosecutors* responded to Watts' statement as though it were a true threat.

## VI.

Had the evidence of Hoffman's religious and political beliefs been excluded, as it should have been, all that would have remained was the letter itself and the indentation analysis showing that Hoffman wrote the letter.  Clearly, this evidence alone is not sufficient to support a conviction under § 871.  With or without the references to Moon, however, the record does not sustain a conviction.

Hoffman's letter contains the words "Ronnie, Listen Chump!  Resign or You'll Get Your Brains Blown Out."  Beneath the text of the letter is a childish drawing of what looks like a popgun with its missile falling to the ground.  Like the statement at issue in *Watts*, Hoffman's statement is expressly conditioned on an event outside his control—here the President's resignation—and suggests that the author did not intend to act upon it.  *Watts*, 394 U.S. at 708, 89 S.Ct. at 1401.  *Alexander v. United States*, 418 F.2d 1203, 1206–07 (D.C.Cir. 1969).

The supposed "threat" is phrased in the passive voice and expresses no intention on the writer's part to kill the President.  On the contrary, it states a mere prediction, albeit a distasteful one, that if the President does not resign he will get his brains blown out.  In this sense, it is indistinguishable from a so-called psychic's predic-

---

**4.** Prior to this case at least, Hoffman was correct.  Threatening the President without more was not against the law.

tion that the President will be killed in a particular year.[5]

In no case before today has a mere prediction been found to constitute a true threat. Indeed, even in cases pre-dating *Watts*, the courts were inclined to throw out indictments premised on such innocuous expressions as predictions or even on strong statements of desire. *See, e.g., United States v. Marino,* 148 F.Supp. 75 (N.D.Ill.1957) ("There can be slain no sacrifice to God more acceptable than an unjust President" and "The officials who aught to be arrested and shot are protected! There can therefore be no respect for any law or its Officers!"); *United States v. Daulong,* 60 F.Supp. 235 (W.D.La.1945) ("If someone does not kill him (the President) he, the defendant, had a notion to do it himself" and "He hoped somebody gets him (the President) tonight, and if somebody did not, he, the defendant, felt like going up there and doing it himself"). Such statements, substantially stronger in some instances than Hoffman's letter, have been found insufficient to establish the mens rea required under § 871(a). As the *Daulong* court observed, "The statute does not penalize the imagining, wishing or hoping that the act will be committed by someone else." 60 F.Supp. at 236.

Hoffman's conviction is reminiscent of those obtained under the old Statute of Treasons, 25 Edw. III, c. 2 (1351), the notorious law which made it a crime to "compass or imagine the Death of the King." *See Watts,* 394 U.S. at 709, 89 S.Ct. at 1402 (Douglas, J., concurring). Indeed, this case harkens back to the fifteenth century prosecution of one Thomas Burdet, who was executed for conspiring to kill the King and Prince "by casting their nativity, foretelling the speedy death of both, and scattering papers containing the prophecy among the people." E. Foss, *Judges of England*

416 (1851); *See* Finer, *Mens Rea, The First Amendment, and Threats Against the Life of the President,* 18 Ariz.L.Rev. 863, 865 & n. 13 (1976). I am disturbed that if the majority is correct, we have not come so far in the last six hundred years as one reading *Watts* might have thought.

## VII.

I am also disturbed that the majority finds it necessary to discuss the contents of the presentence report in its statement of the facts. Obviously, the presentence report was not before the jury that convicted Hoffman. It was added to the appellate record by Hoffman so that he could challenge the length of his sentence. While the majority upholds the sentence, it does not discuss what if any relevance the unfavorable "facts" it selects from the presentence report have to the sentencing issue. The question understandably arises in my mind, and may in others, whether the majority considers these "facts" supportive of its finding on the issue of guilt.

Rule 32 of the Federal Rules of Criminal Procedure establishes that, absent a waiver by the defendant, the contents of a presentence report are strictly off-limits to a jury *or court* considering the issue of guilt or innocence. It follows *a fortiori,* I believe, that a court of appeals may not rely on the presentence report in reviewing the propriety of a conviction.

During the same term that *Watts* was decided, the Supreme Court held that submission of a presentence report to a trial judge before the defendant pleads guilty or is convicted "constitutes error of the clearest kind." *Gregg v. United States,* 394 U.S. 489, 492, 89 S.Ct. 1134, 1136, 22 L.Ed.2d 442 (1969). Justice White, writing for the Court, emphasized the need for strict compliance with Rule 32:

---

5. Unlike the hypothetical statement "I will kill you" posited by the majority, *ante,* at 711 n. 5, Hoffman's statement is conditioned on an event outside his control, it is phrased in the passive voice, and it lacks any expression of intention to act on the writer's part. As I point out in text, each of these considerations has been found in prior cases to weigh against a finding of a "true threat." The majority seems to think that I would find a statement such as "I will kill you" to be a mere prediction simply because it is expressed in the future tense. *Id.* To the contrary, "I will kill you" is clearly an unequivocal declaration of an intention to act.

There are no formal limitations on [presentence reports'] contents, and they may rest on hearsay and contain information bearing no relation whatever to the crime with which the defendant is charged. To permit the *ex parte* introduction of this sort of material to the judge who will pronounce the defendant's guilt or innocence or who will preside over a jury trial would seriously contravene the rule's purpose of preventing possible prejudice from premature submission of the presentence report.

*Id.* All these reasons for respecting the integrity of Rule 32 at trial apply with equal force on appeal.

If the majority considers the "facts" it selects from the presentence report—none of which have been tested by cross-examination or proven beyond a reasonable doubt—to be relevant to the sentencing issue, it should explain why. The reasons are not self-evident for, from all that appears in the record, the district court did not rely on them. If, on the other hand, the majority considers these "facts" pertinent to the question of guilt or innocence, its holding constitutes "error of the clearest kind." *Gregg*, 394 U.S. at 492, 89 S.Ct. at 1136.

Though I share the majority's concern for the safety of the President, I would not unnecessarily sacrifice the guarantees of the Constitution for that ostensible purpose. Nor do I think our task is made easier or our analysis more objective by invoking the names of the victims of the assassinations and assassination attempts (all, incidentally, without any prior threat) that have marred this nation's recent history. *Ante*, at 713. *Watts*, after all, was decided in the wake of the Kennedy and King murders, but the Supreme Court was not deterred in that case from applying the mandates of the Constitution in a detached and faithful manner. Our review of Hoffman's case should be equally objective. The delicate balance between first amendment freedom and public order requires no less.

The majority today, by its reference to these tragic events, simply reveals its own confusion over the vital differences between speech and action. Justice Brandeis cautioned that "The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind." *Whitney v. California*, 274 U.S. 357, 376–77, 47 S.Ct. 641, 648–49, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). To that list might be added, the difference between mere prophesy or hope and an apparent determination to act.

Hoffman's letter to the President was juvenile and offensive. But shooting off at the mouth is not the equivalent of firing a weapon and it is not and should not be made a crime.

I would honor the first amendment and reverse the conviction.

