375 A.2d 336

COMMONWEALTH of Pennsylvania

v.

**Luciano Semiday TIRADO, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 14, 1976.

Decided July 8, 1977.

Xakellis, Perezous & Mongiovi, Michael J. Perezous, Lancaster, for appellant.

D. Richard Eckman, Dist. Atty., Michael H. Ranck, Asst. Dist. Atty., Lancaster, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

## OPINION

MANDERINO, Justice.

Early in the morning of December 15, 1973, Hiran Rodriquez was shot to death on East Vine Street, Lancaster, Pennsylvania. Appellant, Luciano Semiday Tirado, was arrested later that day, and charged with the murder of Rodriquez. Appellant was tried before a jury, convicted of murder in the second degree, and sentenced to not less than six nor more than twelve years imprisonment. This appeal followed. Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202 (17 P.S. § 211.202).

The prosecution's evidence established that the deceased and his brother-in-law, Hermojenes Rosario, were in the La Casa Alegre restaurant when appellant entered and stated that he wished to speak to Rodriquez outside. After some hesitation, Rodriquez agreed, and followed appellant out of the building and onto the sidewalk. Appellant then turned to face Rodriquez and began walking backwards across the street. The deceased followed saying, "What are you going to do with me?" and "Shoot me, shoot me." Appellant then removed a revolver from

his pocket and fired two or three shots at Rodriquez who fell to the street. Rodriquez died of two gunshot wounds of the chest.

Testifying in his own behalf, appellant stated that on the evening before the shooting, he had been confronted by the decedent and Rosario, and that they had demanded that he give them money and a watch and gold chain. When appellant refused to surrender these items they left vowing that they would "get him no matter what." Appellant stated that he had then obtained a revolver from a friend so that he could protect himself. He testified that he went to the restaurant at the time of the incident to seek gambling partners who would be willing to participate in a game of chance. Appellant also stated that the victim and Rosario entered looking for him, that he left the restaurant in an effort to escape them, and they they followed his exit. Appellant said that Rodriquez had a knife, that Rosario had a gun, and that they again confronted him and repeated their demands. Appellant then stated that he fired at the ground once and then in their direction in self-defense, having been cornered by them against a building in such a manner that his escape route was blocked by a car.

Appellant first contends that the prosecution's introduction of evidence, over defense objection, concerning the significance of "machismo," a character trait allegedly peculiar to Puerto Rican males, was irrelevant, prejudicial, and requires the grant of a new trial. We agree.

The prosecution had called police officer Ulises N. Roman, an American of Puerto Rican origin, who was familiar with the customs of the Puerto Rican people. The record reveals that the following occurred during a sidebar conference:

"[DEFENSE COUNSEL]: I would like an offer of proof, your Honor.

[ASSISTANT DISTRICT ATTORNEY]: I'm offering to have Officer Roman testify as to the Puerto Rican Community and his familiarity with it as far as the social values of the Puerto Rican males, as to their honor system and as to the importance of saving face in a confrontation situation.

My theory of the case is that the Defendant started this altercation hoping to, if nothing more, to shame the victim into backing down after the Defendant produced the gun.

In the Puerto Rican Community I think the value system places the highest value on manliness, machismo, what have you, and saving face in a situation like this, and that the victim perhaps foolishly refused to back down in face of a weapon stating that, 'Shoot me,' or 'You're not going to shoot me,' or something to that effect in an effort to show that he had no fear in this situation, and the only way that I can establish this is by showing that this is a community trait within the Puerto Rican Community.

[DEFENSE COUNSEL]: If the Court please, if I may respond to that, there has been no evidence whatsoever in this case other than [the prosecutor's] opening statement which even mentions or infers anything about any pride or so-called machismo,—

[ASSISTANT DISTRICT ATTORNEY]: This is my way of establishing it.

[DEFENSE COUNSEL]: I didn't interrupt you. There has been no evidence of any altercation, and I would oppose his offer of testimony.

.    .    .    .    .    .    .    .

[ASSISTANT DISTRICT ATTORNEY]: Well, I think it's clear that words were exchanged at the store.

[DEFENSE COUNSEL]: That's the altercation—

[THE COURT]: We will permit the offer."

Officer Roman then testified in general about "machismo," stating that the most important values embraced by

Puerto Rican males are " . . . pride, self-pride, and saving face in public." Roman then stated that in a situation involving a confrontation between two Puerto Rican males, the most important consideration " . . . would be not to back down, [and] become known as a coward and thereby be in disgrace."

Here the prosecution was faced with the possibility that the deceased might be cast in the role of an aggressor because he had followed as appellant backed across the street immediately prior to the shooting. The reference to the alleged ethnic characteristic at issue was an attempt to provide the jury with what the prosecution considered to be the true motive for the decedent's actions, and to show that appellant was the real aggressor because he would have known that the decedent would act the way he did and refuse to back down.

The issue for the jury, however, was to decide the particular motivations behind the actions of appellant and of the victim, not those allegedly belonging to Puerto Rican males in general. Even if we were to accept this characterization of Puerto Rican males, a characterization which we specifically refuse to accept, it would not mean that the victim was necessarily possessed of this character trait. Above all else people are individuals, and in a criminal prosecution we are concerned with what each individual did and why it was done in a particular situation. What other individuals of the same ethnic, racial, or religious background might have done in a similar situation is irrelevant. The introduction of this irrelevant material prejudiced appellant by casting him in the eyes of the jury as a member of a group with values allegedly alien to the rest of society, and therefore implying that it was more likely that he committed the crime charged. *United States ex. rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir. 1973).

It is central to our concept of a fair trial that the jury must decide the case on the basis of properly

presented factual issues, and that extraneous and irrelevant matters should be avoided. *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Commonwealth v. Santiago,* 456 Pa. 265, 318 A. 2d 737 (1974); *Commonwealth v. Hirsch,* 455 Pa. 522, 317 A.2d 305 (1974). Appeals to racial or religious prejudice are especially incompatible with the concept of a fair trial because of the likelihood that reason will be dethroned and that bias and emotion will reign.

Judgment of sentence is reversed and a new trial granted.