549 A.2d 981

COMMONWEALTH of Pennsylvania, Appellee,

v.

Walter NORMAN, Appellant.

Superior Court of Pennsylvania.

Argued June 3, 1988.

Filed Oct. 31, 1988.

Helen A. Marino, Assistant Public Defender, Philadelphia, for appellant.

Jo–Ann Verrier, Assistant District Attorney, Philadelphia, for Com., appellee.

Before CIRILLO, President Judge, and CAVANAUGH, ROWLEY, WIEAND, McEWEN, BECK, KELLY, POPOVICH and MELINSON, JJ.

POPOVICH, Judge:

On the Commonwealth's application for reargument, this case was granted *en banc* consideration to review a panel

decision of this Court awarding the defendant, Walter Norman, a new trial. After an examination of the record facts and the law, we now reverse our initial decision of December 8, 1987, and affirm the judgment of sentence.

The facts, viewed in a light most favorable to the verdict-winner, as well as giving the Commonwealth all favorable inferences to be derived therefrom, reveal that, at approximately 5:30–6:00 a.m. on the 13th day of May, 1981, Cassandra Harris had exited her apartment and was on her way to the trolley station to go to work. When she heard the sound of a vehicle starting, she turned and saw the defendant drive next to her. He offered her a ride to the trolley station. She accepted.

It seems that Ms. Harris and the defendant had been living together from 1978 until November of 1980. When Ms. Harris learned that, while she was out of her apartment in December of 1980 to see a friend, the defendant had been charged with robbing and raping two women in her apartment, she discontinued living with him.

On the morning of the 13th of May, while supposedly en route to the trolley station, the defendant asked to reconcile with Ms. Harris. He wanted her to leave the jurisdiction since he had jumped bail on the rape and robbery charges arising in Delaware County. Ms. Harris was aware of the circumstances and refused the offer.

After the defendant had purchased gasoline, he continued to drive, and, between Woodland Avenue and Grays Ferry in South Philadelphia, "the discussion became pretty much intense" in regard to whether Ms. Harris would leave with the defendant. She repeated her position and this prompted the defendant to say, "there is a contract out on you". Ms. Harris asked why anybody would want to harm her.[1] At this stage, she reached for the door handle and the appel-

1. It was the Commonwealth's theory that, when the police were investigating the Delaware County case, the defendant asked Ms. Harris to be his alibi and tell the police he was with her on the date of the incidents. However, Ms. Harris refused to lie for the defendant. She told police she was with her girlfriend when the incidents occurred.

lant accelerated and turned down a small street. Again, the defendant asked and was told by Ms. Harris that there could be nothing between the two. With this, the defendant, according to Ms. Harris, said, "Well, maybe there can't be nothing, nothing, and there's only one thing to do."

The defendant, after his remark to Ms. Harris, reached toward the back seat of the vehicle where a black jacket lay. It was Ms. Harris' belief that the defendant was "searching for—wh[at she] thought was a gun." Ms. Harris reacted by reaching for the clutch, she also wanted to place her foot on the accelerator in the hope of causing the vehicle to move forward and draw attention to her plight.

When the defendant released his hold of Ms. Harris, he reached toward the back seat again. As told by Ms. Harris:

By this time, we were both wrestling for the gun. I grabbed at it, and I did have my hand on it, and I tried to put it between the cushions of the back seat, and so he was over me, grabbing the gun. By this time, I had fell [sic] from the front seat to the back seat * * * sort of like in the middle of the seat, lying on the back seat from the front seat. He reached over and placed the gun on my neck, the gun fired. By this time, I could feel the life from my body leave, and I asked him not to hurt me anymore, because there was nothing I could do to hurt him. So, I asked him to place my body somewhere where I could be found, and he did, and he left, and told me good-bye.

During the course of the assault, Ms. Harris recounted how, while holding her down with his left hand, the defendant adjusted the cylinder of the gun to align it so the hammer rested on a bullet. Also, after he shot the victim, the defendant stated, with an "expressionless" face and in a calm manner, "I should have killed you, I should have killed you."

It was not until 7:00 a.m., on the morning that she was shot, that Ms. Harris was found behind an Exxon station in some bushes. She could not speak or move. Thereafter, she was transported to St. Agnes Medical Center, Emergen-

cy Ward. The police questioned the victim sometime thereafter and were apprised of what transpired. The shooting left the victim paralyzed from her shoulders down.

From March of 1981 until the end of 1983, the defendant remained a fugitive. Once apprehended, he was tried and convicted by a jury of aggravated assault and possessing an instrument of crime. After the denial of post-verdict motions, sentence was imposed by the court below.[2] An appeal was filed and heard by a panel of this Court, which reversed the trial court's allowance of testimony by a Commonwealth witness (Detective David Piefer) that informed the victim, before the shooting, to be careful of the defendant because he thought the defendant was "dangerous".

The panel, over Judge Olszewski's dissent, found the testimony to be an expression of the witness' opinion as to the defendant's character, a matter which was not in issue, and, therefore, was considered to be irrelevant and immaterial. Because this was found to prejudice the defendant's right to a fair trial, any offer by the trial court to give a cautionary instruction, to minimize the effect of the testimony, was held by the panel majority to "have served only to remind the jury of the testimony and enhance its effect." As a result, a new trial was granted. However, by order of this Court dated December 8, 1987, the Commonwealth's application for reargument was granted and the case was heard *en banc.*

■ Before addressing the issue which prompted *en banc* consideration, we need to respond to the allegation of the defendant that he was unduly prejudiced and denied a fair trial when the trial court allowed the Commonwealth to introduce evidence of his prior criminal activity to the jury.

**2.** At this stage, we would like to echo the sentiments of the sentencing court that the defendant should consider himself fortunate that the District Attorney of Philadelphia County did not press for an attempted murder conviction "... because if there was one case that deserved the maximum pressing of an issue in Philadelphia, this was it."

The law is quite clear in this area. Pennsylvania holds that evidence of unrelated criminal conduct of an accused is inadmissible to prove his propensity for violence. This forecloses the trier-of-fact from reasoning that the defendant, more likely than not because of his prior criminal behavior, committed the crime(s) for which he is presently being tried. *See Commonwealth v. Travaglia*, 502 Pa. 474, 492, 467 A.2d 288, 297 (1983), cert. denied, *Lesko & Travaglia v. Pennsylvania*, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984); *see also Commonwealth v. Clayton*, 506 Pa. 24, 483 A.2d 1345 (1984). However, various exceptions have emerged to circumscribe this exclusionary rule, one of which is the permissibility of evidence of other crimes where it is relevant to prove motive.[3]

Instantly, it was the Commonwealth's contention that the defendant was forced to shoot the victim because of her failure to provide him with an alibi to the previously mentioned rapes/robberies in Delaware County. This led to the defendant's arrest therefore and subsequent "bail-jumping" and hope that the victim would leave this jurisdiction with him.

Without the introduction of the defendant's arrest for the Delaware County crimes, the nature of which (rape and robbery) was kept from the jury, the veniremen would only have had evidence of the defendant offering the victim a ride and a discussion between the two which culminated in the defendant shooting the victim in the neck. Her body was "dumped" at the rear of a gas station without the defendant summoning any help.

**3.** Some of the other exceptions, allowing for the introduction of prior criminal conduct attributed to an accused, consist of "intent", "identity", "plan, scheme and design" and the "absence of mistake or accident". *See Travaglia*, supra. Where evidence is sought to be interjected into a trial, reflective of any one or more of the preceding exceptions to the prior criminal conduct rule, a balancing must be engaged in by the trial court in weighing the probative value against the prejudicial effect of the proffered evidence. If the former outweighs the latter, the evidence is admitted. Otherwise, it is excluded. *Id.*

However, with the admission of the defendant engaging in criminal activity against two women in Ms. Harris' apartment, while in her absence, the picture becomes more clear as to what might have motivated the defendant to shoot the victim, *i.e.*, her refusal to provide the defendant with an alibi or leave the jurisdiction, both of which stem from the Delaware County offenses. This also discounted the defendant's "accidental shooting" version of what transpired and brought into focus plausible reasons ("motive") for the shooting. *See Travaglia*, supra. Without such evidence, we have a disjointed series of acts absent any symmetry or rationale as to their origin or objective. Thus, to clarify matters, and put the facts in perspective and in some sort of order, we deem the manner and method by which the trial court controlled the introduction of the Delaware County crimes as proper and, at the same time, steered the trial on a course free from "prejudicial" waters.

▮ The second and final issue we shall deal with relates to the defendant's assertion that the trial court erred in permitting Detective Piefer to testify that he told Ms. Harris that he believed the defendant to be "dangerous". It is the defendant's contention that the complained-of testimony had no probative value and constituted an assault upon his character warranting a new trial to remedy the matter.

By Information No. 86–022715, the defendant was charged with aggravated assault, a felony of the second degree, and he was adjudged guilty of the same by a jury of his peers following the reading of the instruction advising them that:

> Aggravated assault by definition requires either an intentional, knowing or reckless inflection of serious bodily injury.

*See also* 18 Pa.C.S. § 2702. The intent element in the aggravated assault statute, like its counterpart in the simple assault statute (18 Pa.C.S. § 2701), may be implied from the circumstances, such as acting in a manner which manifests a reckless, culpable disregard for the safety of others.

*See Commonwealth v. Mott,* 372 Pa.Super. 133, 539 A.2d 365 (1988).

Thus, the actor can be charged with and convicted of the crime if he acts recklessly as well as intentionally or knowingly causing injury. *Id.* The term "recklessly", as used in 18 Pa.C.S. § 2702, is defined at 18 Pa.C.S. § 302(b)(3) as follows:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

If the testimony of the victim is to be believed over that of the defendant's accounting of "misadventure", and we have no reason to alter the jury's credibility determination on this point, we have a recitation of facts whereby the victim voluntarily entered the defendant's vehicle without any reason to believe that the defendant harbored any malevolence toward her, even though she had terminated their relationship and refused to provide the defendant with an alibi for the criminal assault of two women in her apartment—the basis for the severing of ties.[4]

The victim then gave an accounting in which the defendant stated that a "contract" had been "put out" on the victim, and that she probably thought that it was he who issued the "contract". Further, the victim testified that the defendant then told her that her refusal to leave the area in his company left him but one choice, which, at the time he was so stating this, he was reaching under a coat on the rear seat of the vehicle where she believed was a gun.

**4.** As the trial court remarked at the demurrer stage of the case, the victim's "naivety" did not preclude the Commonwealth from proffering prior-criminal-acts evidence of the defendant to establish a "motive" for the shooting.

The victim's efforts to escape from the vehicle, by lifting the door handle and manipulating the clutch and stepping on the accelerator to attract attention to her dilemma, were foiled by the defendant. The ensuing struggle with the defendant over the gun caused her to land on the rear seat of the vehicle. With all the struggling, the victim became exhausted and this allowed the defendant to hold her on the seat with the use of his left hand against her left arm.

The victim then proceeded to remember how the defendant checked the chamber of the weapon to assure its containment of a bullet. Next, as she lay motionless on the back seat, the defendant reached over the front driver's seat, with right arm fully extended and placed the barrel of the weapon against the left side of the victim's neck. He fired but one shot and followed this with a dispassionate remark to the effect that he should have killed the victim. She pleaded that he not do so. Rather, she inquired if the defendant would merely place her body where it would be found. The defendant complied by taking the victim to the back of a service station in South Philadelphia and leaving her there in her speechless and paralyzed condition.

With no intention of summoning help, as evidenced by a total absence of empathy for the victim's welfare, the defendant absconded and remained at-large for approximately two years before the authorities apprehended him.

Reading the facts in light of the applicable standard of review, we find that the evidence was "overwhelming" in its quality and volume so as to justify an affirmance of the defendant's conviction and judgment of sentence. The sentencing court accurately described the defendant as lacking heart, conscience, human warmth and caring so as to be possessed of an "absolute cold-heartedness", which we find to be inconsistent with his defense of "aggravated assault by accidental misadventure".

We assess the facts as consonant with a finding supportive of the jury's verdict under any element of aggravated assault, be it an "intentional", "knowing" or "reckless" act which provided the impetus for the conduct prosecuted.

Therefore, because we perceive the evidence to be "overwhelming", we rule that the detective's testimony that he advised the victim, prior to the shooting, that the defendant was "dangerous" was "harmless" error. *See Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978).

Moreover, as pointed out by the dissenting member of the panel which initially heard this case:

> ... because appellant refused the court's offer for a limiting instruction to the jury, appellant is now precluded from relief on this claim. "When counsel chooses to refuse appropriate curative instructions for [a] legitimate tactical reason, the defense may not plead prejudice on appeal." *Commonwealth v. Miller*, 333 Pa.Super. 58, 62–63, 481 A.2d 1221, 1223 (1984).

We agree and, thus, for the reasons herein stated, we affirm the judgment of sentence.

MELINSON, J., concurs in the result.

WIEAND, J., files a dissenting opinion.

WIEAND, Judge, dissenting:

Walter Norman was tried by jury and was found guilty of aggravated assault and possession of an instrument of crime in connection with the shooting of his former girlfriend, Cassandra Harris. On direct appeal from the judgment of sentence, he argues that it was error (1) to allow evidence of prior criminal conduct which had caused the disaffection between himself and Cassandra Harris; and (2) to permit an expression of opinion by a police officer that appellant was dangerous. The majority holds, and I agree, that reference to appellant's prior criminal conduct was properly received to show motive and also to show the relationship between appellant and the victim and the dispute between them which culminated in the shooting. However, I am unable to agree with the majority's determination of the second issue. I would hold that it was error to allow the jury to hear evidence of the investigating police officer's opinion that appellant was a dangerous person. Because this error cannot be deemed harmless, I would

reverse the judgment of sentence and remand for a new trial.

Harris and Norman had been romantically involved and had lived together for two years. They separated after Norman was arrested for the December, 1980, kidnap, rape, and robbery of two women. Harris not only refused to provide Norman with an alibi, as he had requested, but also cooperated with investigating police. Norman, although arrested and charged, failed to appear at the preliminary hearing and became a fugitive.

On the morning of May 13, 1981, he appeared in front of Harris's apartment and offered to give her a ride to work. She accepted. During the ride, Norman asked Harris to resume their prior relationship and flee the jurisdiction with him. Harris refused, and an argument ensued. According to the trial testimony of Harris, appellant told her there was only one thing to do, reached into the back seat, and retrieved a gun. After a brief struggle, appellant was able to hold Harris down and then shot her in the neck. Harris, although seriously hurt, did not lose consciousness. Because she knew Norman was a fugitive and therefore could not take her to a hospital, she asked to be taken to a place where she would be found. Norman took her to a gasoline service station, where she was found and removed to a hospital. Harris is now a permanent quadriplegic. Appellant's testimony at trial was that he had borrowed the car from a friend and did not know that there was a gun in it. He testified that the gun had come into view when a sudden lurch caused an armrest to fall. He contended further that the gun had discharged accidentally during a struggle to retrieve it.

The manner in which the shooting occurred depended primarily on the conflicting testimonies of Harris and Norman. The credibility of the two witnesses, therefore, was an important determination to be made by the jury.

Evidence of prior crimes and/or acts of violence is inadmissible to prove a defendant's propensity for violence or bad character. *Commonwealth v. Banks*, 513 Pa. 318, 349,

521 A.2d 1, 17 (1987); *Commonwealth v. Morris,* 493 Pa. 164, 175, 425 A.2d 715, 720 (1981). However, evidence of prior crimes or violent acts may be admissible where it is relevant for some other legitimate purpose. *Commonwealth v. Banks, supra; Commonwealth v. Claypool,* 508 Pa. 198, 204, 495 A.2d 176, 178 (1985). Among the several exceptions to the general rule is that which permits evidence of prior criminal conduct to show motive.

In this case, it was the contention of the Commonwealth that the shooting had not been accidental but intentional. It had been committed, according to the Commonwealth, in retaliation for the victim's refusal to supply appellant with an alibi in the prior criminal proceedings and because of her refusal to flee with him in order to avoid prosecution. The prior criminal charges, therefore, were relevant to show motive. In order to minimize the harm from this evidence, however, the trial court did not permit the jury to learn of the nature of the prior crimes; the jurors learned only that appellant had committed a crime against two women and that the crime had been committed in Harris's apartment. Moreover, the jurors were carefully instructed on the limited use to be made of this evidence.

Under these circumstances, the trial court did not err. Appellant's prior criminal conduct was an essential part of the Commonwealth's case and necessary to the jury's understanding of the circumstances surrounding the shooting.

The second issue concerns an evidentiary ruling by the trial court which permitted Detective Peter Piefer to testify, over objection, that while Norman was a fugitive on the prior charges, he, Piefer, had told Harris, "to be careful *because I thought Walter Norman was dangerous."* (emphasis added). Appellant contends that the ruling was erroneous and that the detective's opinion that appellant was dangerous was unfairly prejudicial. I agree.

The objectionable testimony consisted of the witness's opinion about the defendant's character. However, the defendant's character was not an issue in the case, and the

detective's opinion regarding the defendant's character was irrelevant and inadmissible. As a general rule, "[t]he character of the defendant is not in issue in a criminal proceeding until the accused himself does something which puts it in issue." 10A P.L.E., *Criminal Law* § 361. See: *Commonwealth v. Anthony,* 91 Pa.Super. 518, 521 (1927). In a criminal prosecution, the factfinder's concern is with what the defendant did and why it was done, and evidence of his general character, having only slight probative value and great potential for prejudice, is inadmissible. McCormick on Evidence §§ 186, 188 (3d ed. 1984). Cf. *Commonwealth v. Tirado,* 473 Pa. 468, 375 A.2d 336 (1977). Moreover, when the defendant's character is in issue and, therefore, relevant, it must be proved by evidence of his reputation or by evidence of conduct which reflects a character trait. The personal opinion of the witness is not admissible to prove the character of the defendant. See: *Commonwealth v. Neely,* 372 Pa.Super. 519, 524, 539 A.2d 1317, 1320 (1988); *Commonwealth v. Gaines,* 167 Pa.Super. 485, 490, 75 A.2d 617, 619 (1950).

The Commonwealth argues that even if the trial court's ruling was incorrect, it was harmless. "[A]n error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." *Commonwealth v. Story,* 476 Pa. 391, 412, 383 A.2d 155, 166 (1978). In the instant case, the undisputed evidence was that Harris had been seriously injured as a result of the shooting. Appellant did not deny this fact. Whether the defendant had gone gunning for the victim and shot her deliberately and intentionally in retaliation for her cooperation with police in the prior incident or whether he had sought her out to discuss their personal relationship and subsequently engaged in a dispute which resulted in an accidental shooting, however, was a question of fact for the jury. In order to resolve this issue the jury was necessarily required to determine the credibility of the victim and the defendant, for they were the only persons present at the

time of the shooting. Under these circumstances, it cannot be said beyond a reasonable doubt that the opinion of an experienced police officer that appellant was a dangerous person did not have an effect on the jurors' decision.[1]

Before submitting the case to the jury for decision, the trial judge sua sponte asked defense counsel if he desired a cautionary instruction to be given to the jury regarding the detective's opinion that appellant was a dangerous person. Defense counsel declined the trial court's offer which, of necessity, would have repeated or at least reminded the jury of the police officer's opinion. The majority holds that the defendant is thereby precluded from asserting prejudice. I must disagree. In the first place, the suggested instruction was too late. The jury had already heard the trial court rule that the evidence was properly for it to consider. Secondly, it is wholly unrealistic to believe that a jury which has been permitted to hear prejudicial evidence, with the trial court's erroneous imprimatur, can wash such evidence from its collective mind by a belated "cautionary instruction." "[C]urative instructions do not, without exception, cure." *Commonwealth v. Channell,* 335 Pa.Super. 438, 454, 484 A.2d 783, 791 (1984). Finally, the rule espoused by the majority puts the defendant in an untenable position. A defendant who has been harmed by an erroneous evidentiary ruling must either consent to having the prejudicial matter repeated by the trial court or surrender the right to obtain post-trial and appellate review of the trial court's ruling. The rule advanced by the majority, I submit, is an alarming and unwarranted incursion into the right of an accused to receive a fair trial. Therefore, I dissent. "When an error in a trial is of such consequence that, like a dash of ink in a can of milk, it cannot be strained out, the only remedy, so that justice may not ingest a tainted fare, is a new trial." *Commonwealth v. Gaerttner,* 335 Pa.Super.

1. The detective's opinion testimony was not merely repetitive of prior testimony by the victim. Although she testified that she had been warned by the police to be careful because she had cooperated in the investigation of the prior offense, there was no prior testimony that the police, or any one of them, considered appellant to be a dangerous or violent person.

226

203, 220, 484 A.2d 92, 101 (1984), quoting *Lobalzo v. Varoli,* 409 Pa. 15, 21, 185 A.2d 557, 561 (1962).

I would reverse and remand for a new trial.