In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 06-3300 & 06-3457

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

STEVEN J. PARR,

*Defendant-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 04 CR 235—**William C. Griesbach**, *Judge.*

ARGUED SEPTEMBER 7, 2007—DECIDED SEPTEMBER 18, 2008

Before BAUER, POSNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Steven Parr was convicted of threatening to use a weapon of mass destruction against a federal government building and was sentenced to 10 years in prison. *See* 18 U.S.C. § 2332a(a)(3) & (a). On appeal, Parr argues that he was convicted for conduct protected by the First Amendment and that the district

court abused its discretion in allowing the jury to hear evidence of his extensive background relating to bomb-making and his fascination with domestic terrorism.

On those issues, we affirm. The First Amendment allows restrictions on speech containing threats, and the jury was entitled to find that Parr's statements about bombing the federal building in Milwaukee qualified as "true threats." As for the evidence regarding Parr's background, it was highly relevant to the jury's "true threat" determination. One item of evidence, however—*The Anarchist Cookbook*—should not have gone to the jury in its entirety. This manual of the 1970s antiwar subculture contains recipes for making homemade explosives and weaponry. It was found in Parr's possession and parts of it were relevant and admissible, but it was a mistake to submit the entire book to the jury during deliberations. The error, however, was harmless.

Parr also raises a number of other challenges—both to his conviction and his sentence—but only one has merit. In calculating Parr's advisory sentencing range under the Sentencing Guidelines, the district court concluded that Parr's crime "involved" a "federal crime of terrorism" and therefore applied a 12-level enhancement under U.S.S.G. § 3A1.4. We conclude that the threat itself did not "involve" a crime of terrorism as that term is understood under the guideline, but Parr's crime might still qualify for the enhancement if the district court finds that a purpose of the threat was to "promote" a crime of terrorism. We therefore remand for resentencing.

In light of the remand, we need not decide the issue raised in the government's cross-appeal: whether the 10-

year sentence, well below the guidelines range of 360 months to life, is unreasonable. No doubt the sentence was lenient relative to the range, but we withhold judgment on whether this degree of leniency was adequately justified. The range, and the sentence imposed, may be different on remand.

## I. Background

In the summer of 2004, the FBI received a letter warning that "somebody is making plans to blow up the federal building" in Milwaukee. The letter writer, John Schultz, was an inmate in Wisconsin's prison system, and the "somebody" was his cellmate, Steven Parr. Schultz told the FBI that Parr had repeatedly threatened to blow up the Reuss Federal Plaza in Milwaukee and that these comments should be taken seriously because Parr knew a lot about bombmaking chemistry, was a follower of the domestic terrorist Timothy McVeigh, and would complete his prison term (for marijuana distribution) in less than a month. After briefly investigating, the FBI learned that Parr had previously been found in possession of bombmaking instructions and that one of his prison notebooks contained an antigovernment statement. Agents convinced Schultz to wear a wire to record Parr's statements.

The night before Parr was to be released Schultz recorded a lengthy conversation between the two that would become the cornerstone of this prosecution. At first, the conversation centered on bombmaking techniques. Parr explained to Schultz how to build various types of bombs,

discussed where to purchase particular chemicals useful for creating explosives, and shared his past experiences with manufacturing and detonating homemade explosives. The details were grisly. To take just one example, Parr described a bomb he had designed to be hidden in a Noxzema face-cream container and said he planned to use this device against an ex-girlfriend with the aim of disfiguring her. Parr said he had completed construction of this bomb but chickened out and never used it. At another point in the conversation, Parr confessed to burning down a different ex-girlfriend's house using napalm, a crime for which he had never been charged and for which the statute of limitations had expired.

It was against this background of disclosures that Parr described his plan to blow up the Reuss Federal Plaza in Milwaukee. He said he planned to construct a bomb inside a delivery truck, park the truck outside the federal building, and walk inside as if to make a delivery. He explained that he would briefly enter the building but then would slip outside immediately and run as far as he could before the bomb exploded.

The plan was detailed. Parr mentioned the number of detonators and drums of explosives he would use, where he would park, and how he would deflect suspicion. Some of the plan was described conditionally—he said, for example, that he would have to find a schedule of conventions or employee meetings at the Reuss Plaza so he could explode the bomb at a time when a lot of federal employees were in the building (ATF agents were of particular interest). But much of the plan was described

in definite terms: "Oh, it will be extremely loud. Echoing off the buildings and . . . [the federal building], it's all glass. The damage that will be done will just be complete."

Parr explained that he wanted to be "the next McVeigh" and that he had chosen the federal building in Milwaukee as his target because it was in "down home America" and would "make a wonderful statement." He said that antigovernment "militia groups" would be inspired by his bombing, just as they were when McVeigh blew up the federal building in Oklahoma City. He said: "I may not be as radical as [McVeigh], but I surely agree with him and it might unite more people. It might generate some people to stand up and say, you know what? Enough is enough." Parr promised to give Schultz an interview afterward so he could sell his story as Parr's former cellmate to the *National Enquirer* and other publications.

Parr did not specify an exact time frame for his plan, noting that he would be on probation for eight years after his release and would use that time to "refine [his] techniques" because he would get only one chance. But he vowed to pull off his plan within ten years: "Well, I'm 40 now. Maybe 50. Maybe it'll be my 50th birthday present." Despite some of his more conditional statements and the uncertainty about the timing, Parr emphasized that he "absolutely" would execute his plan:

> Schultz: So all this shit that you been tellin' me is not just all bullshit. Someday, someone's gonna get it I hope right?
>
> Parr: Absolutely.

Schultz:  No doubt about it.

Parr:      No doubt.

Schultz:  Someone's gonna get it.

Parr:      Someone's gonna get it.

The conversation concluded with the two men discussing Schultz's status as an accomplice by virtue of the knowledge he now had of the "inside details" of Parr's plans. Parr also mentioned that he had committed "several federal felonies" just by telling Schultz how to make a bomb, adding that "in today's terrorist environment," it's "a very serious crime" to "explain to someone how to make a bomb."

The day after this conversation, Parr was released to a halfway house but was quickly rearrested and indicted for threatening to use a weapon of mass destruction against a federal government building in violation of 18 U.S.C. § 2332a(a)(3). After his arrest Parr voluntarily spoke to FBI agents and denied having made the statements. Given the existence of the recording, that wasn't a tenable position. At trial prosecutors played the recording of Parr's remarks and called Schultz to testify about his conversations with Parr. Parr testified and admitted making the statements (he could hardly do otherwise) but claimed he had been joking—just mouthing off to his cellmate.

Prosecutors painted a different picture. Schultz testified that he had taken Parr's comments seriously. A number of witnesses—including three of Parr's ex-girlfriends and two former neighbors—testified that Parr had long hated

the government, experimented with explosives, and admired domestic terrorists. One ex-girlfriend testified that Parr owned chemistry equipment and liked to experiment with chemicals and explosives. She said he liked to read books on bombmaking and ordered kegs containing black powder. More troubling, she testified that he frequently spoke of Timothy McVeigh and that he was "fascinated" with and upset by McVeigh's execution. She also mentioned that he had spoken of blowing up buildings—remarks she believed were serious—and that he went by the nickname "Uni," apparently a reference to Ted Kaczynski (the "Unabomber"), another domestic terrorist.

Another former girlfriend testified that she had seen Parr construct about a dozen pipe bombs and use one to blow up a log. She also described Parr's obsession with chemicals and bombmaking books, and she mentioned seeing a small can of black powder, which Parr kept in the garage and was afraid he would be caught with. The third ex-girlfriend and the two former neighbors gave similar accounts.

Prosecutors also introduced a number of books and notebooks found in Parr's possession at the time of his earlier arrest for drug distribution, including *The Anarchist Cookbook*, a handbook from the 1970s that contains instructions for a litany of illicit activities ranging from the manufacture of illegal drugs and explosives to the creation and use of various other weapons and telecommunication equipment. Finally, prosecutors presented expert testimony that Parr would have been capable of carrying out his threat.

The jury convicted Parr, and at sentencing the district judge applied two enhancements in calculating Parr's advisory sentence under the sentencing guidelines: a 12-level enhancement because Parr's offense "involved a crime of terrorism" and a 2-level enhancement for obstruction of justice based on a finding that Parr committed perjury at trial. *See* U.S.S.G. §§ 3A1.4, 3C1.1. The resulting advisory guidelines range was 360 months to life in prison. The judge considered a sentence within this range to be "grossly disproportionate" to the seriousness of Parr's offense, emphasizing that it was "unclear" whether Parr had actually intended to carry out his threat and noting that his threat was not imminent. The judge sentenced Parr to a below-guidelines term of 120 months in prison. Parr appealed both his conviction and sentence, and the government appealed the sentence.

## II. Discussion

### A. First Amendment Challenge and Related Claims of Evidentiary Error

Parr first argues that his conviction was unconstitutional because the statements for which he was convicted were protected by the First Amendment. But the First Amendment does not preclude restrictions on certain categories of speech having little or no social value, and threats are one such category. *Virginia v. Black*, 538 U.S. 343, 358-59 (2003). A statement qualifies as a "true threat," unprotected by the First Amendment, if it is "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individu-

als." *Id.* at 359; *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992); *Watts v. United States,* 394 U.S. 705, 707 (1969) (distinguishing a threat from constitutionally protected speech such as political hyperbole).

We think it readily apparent that Parr's statements were threats, but ultimately that question was for the jury. *United States v. Saunders*, 166 F.3d 907, 912 (7th Cir. 1999); *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990). The jury was properly instructed that Parr's statements qualified as a true threat if a reasonable person would understand that the statements, in their context and under all the circumstances, would be interpreted as "a serious expression of an intention to use a weapon of mass destruction to damage the Reuss Federal Plaza." The jury was also instructed that it must be satisfied that Parr "intended his statement[s] to be understood in that manner." The instruction continued as follows:

> A "true threat" is a serious statement expressing an intention to do an act which under the circumstances would cause apprehension in a reasonable person, as distinguished from idle or careless talk, exaggeration, or something said in a careless manner. To constitute a true threat, however, it is not necessary that [Parr] actually intended to use a weapon of mass destruction to damage the building or that he had the capacity to do so. Nor is it required that he communicated the threat to anyone connected with the Reuss Federal Plaza.

To the extent Parr is making an argument about the scope of the true threat doctrine and the proper defini-

tion of true threats, our review would be de novo. But at oral argument Parr explicitly disclaimed any challenge to the jury instructions. In convicting Parr, the jury implicitly found that Parr's statements were true threats based on the foregoing definition, and we can overturn the verdict only if Parr shows that there was no evidence to support it. *Saunders*, 166 F.2d at 912. The supporting evidence was abundant. Parr stated repeatedly and consistently that he was going to bomb the federal building in Milwaukee, and nothing in the context required the jury to find that he was joking or using hyperbole. *Cf. Watts*, 394 U.S. at 708 (comments at political rally were political hyperbole as opposed to true threats, especially where crowd immediately laughed at the remarks and the speaker conditioned his threat on an event that he had vowed would never happen); *see also United States v. Guevara*, 408 F.3d 252, 258 (5th Cir. 2005) (distinguishing true threat from "idle or careless talk, exaggeration, or something said in a joking manner").

It is true that Parr gave no precise time for carrying out his plan and did not relay his threats directly to his intended victim. But neither point is dispositive. A threat doesn't need to be communicated directly to its victim or specify when it will be carried out. *Cf. Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616-17 (5th Cir. 2004) (threat must be "communicated to either the object of the threat *or a third person*" (emphasis omitted) (emphasis added)); *United States v. Howell*, 719 F.2d 1258, 1260 (5th

Cir. 1983) (time frame not specified).[1] Parr claimed his discussion of bombing the Milwaukee federal building was just prison "talk"—common among inmates who vent their frustrations against the government—but Schultz testified that Parr's statements were very different from the ordinary antigovernment hyperbole often heard in prisons. The jury was entitled to agree.

Parr's constitutional argument spills over into his various claims of evidentiary error, which can be consolidated under the umbrella of one basic question: what sort of evidence was relevant and admissible to prove that his statements qualified as a true threat? At trial the government called several of Parr's former girlfriends and neighbors to testify about his pervasive interest in explosives and domestic terrorism, including his long history of building pipe bombs, storing explosives, and experimenting with chemicals; his admiration for domestic terrorists

---

[1] *See also United States v. England*, 507 F.3d 581, 589 (7th Cir. 2007) (under witness tampering statute, threat need not be communicated to victim); *United States v. Stewart*, 420 F.3d 1007, 1016 (9th Cir. 2005) (threat need not be communicated to victim); *Doe v. Pulaski County Spec. Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002) (there must be communication to "the objects of the purported threat or to a third party"); *United States v. Martin*, 163 F.3d 1212, 1214-16 (10th Cir. 1998) (defendant told friend he was going to kill police detective); *Schneider*, 910 F.2d at 1570-71 (letter threatening trial judge was mailed to the state supreme court); *United States v. Raymer*, 876 F.2d 383, 391 (5th Cir. 1989) (victim need not actually receive threat).

Ted Kaczynski and Timothy McVeigh; and his use of the nickname "Uni," a reference to the Unabomber. Prosecutors also called an expert on explosives who testified that with practice, Parr would be capable of carrying out his plans. From this evidence the government asked the jury to infer that Parr was serious when he said he planned to bomb the federal building—that he actually intended to carry out his threats—and that he had the knowledge and ability to do so. Parr argues that his intent and ability to carry out his threats were irrelevant and the district judge abused his discretion in admitting this evidence.

It is well-established that the government is not required to prove that the defendant in a threat case intended or was able to *carry out* his threats. *Black*, 538 U.S. at 359-60; *United States v. Fuller*, 387 F.3d 643, 647-48 (7th Cir. 2004); *United States v. Hoffman*, 806 F.2d 703, 707 (7th Cir. 1986). Antithreat statutes thus differ from attempt or conspiracy statutes, which require that the defendant intend or agree to commit the predicate crime. But it does not follow that Parr's intent was irrelevant.

To assess whether Parr's statements were true threats, the jury needed to make inferences from the background and context about his demeanor at the time he made the statements—to decide, under the circumstances, whether he conveyed the impression that he was serious or joking. A person who says he is going to bomb a building is more likely to give the impression he is serious if he actually *is* serious—if he actually plans to carry out his threat and is able to do so. *See Guevara*, 408 F.3d at 258 (test for a threat is whether the statements "would cause

apprehension in a reasonable person"). So if the government could show that Parr was serious about his plan to bomb the Milwaukee federal building, that evidence was highly relevant.

For the same reason, the background evidence was also relevant to whether Parr *intended* that his statements be understood as a threat—a question with added significance here because the jury was told it could convict only if Parr *intended* his comments to be understood that way. Traditionally, the law in this and most other circuits has been the opposite—an objective "reasonable person" test has applied, an inquiry that asks whether a reasonable speaker would understand that his statement would be interpreted as a threat (the "reasonable speaker" test) or alternatively, whether a reasonable listener would interpret the statement as a threat (the objective "reasonable listener" or "reasonable recipient" test). *See, e.g., United States v. Stewart*, 411 F.3d 825, 827-28 (7th Cir. 2005); *Saunders*, 166 F.3d at 913-14 (collecting true threat cases and discussing the distinction between the "reasonable speaker" and "reasonable listener" approaches); *Schneider*, 910 F.2d at 1570-71. But the Supreme Court's decision in *Virginia v. Black*, *supra*, has raised some questions about whether that is still true.

In *Black*, the Supreme Court considered the constitutionality of a Virginia statute making it a criminal offense to burn a cross with intent to intimidate. 538 U.S. at 347-48. The Court invalidated the statute on First Amendment grounds, *id.* at 367, but the justices were divided on the rationale. The case produced five opinions: a plurality opinion by Justice O'Connor (joined by Chief Justice

Rehnquist, Justice Stevens—who also wrote a brief concurrence—and Justice Breyer); an opinion by Justice Scalia concurring in part and dissenting in part (joined in part by Justice Thomas); an opinion by Justice Souter concurring in part and dissenting in part (joined by Justices Kennedy and Ginsburg); and a dissent by Justice Thomas.

Most of the debate among the justices concerned the question of whether the statute impermissibly discriminated on the basis of content or viewpoint and the validity of a particular provision in the statute making the burning of a cross prima facie evidence of the defendant's intent to intimidate. For our purposes here, however, it is enough to note that the plurality offered a new definition of true threats, part of which we have quoted above. The entire passage is as follows:

> "True threats" encompass those statements where the speaker *means to communicate a serious expression of an intent to commit an act of unlawful violence* to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Id.* at 359-60 (emphasis added) (citations omitted).

Based on the language we have highlighted, some circuits have held that a statement qualifies as a true threat only if the speaker subjectively intended it as a threat. *See United States v. Magleby*, 420 F.3d 1136, 1139 (10th Cir. 2005); *United States v. Cassel*, 408 F.3d 624, 631 (9th Cir. 2005); *see also United States v. Cope*, No. 06-5431, 2008 WL 2630366 (6th Cir. July 3, 2008) (unpublished) (discussing *Black* in the context of a threat statute and jury instructions that contained an intent element but deferring the question of whether the Supreme Court altered the definition of true threats in light of the procedural posture of the case).[2] The court in *Cassel* noted that the ultimate holding

---

[2] Not all courts have agreed that *Black* changed the test for true threats. *See, e.g., Porter*, 393 F.3d at 616 (interpreting *Black* to require only that the speaker knowingly made the statement, not subjectively intended it as a threat). The Ninth Circuit is internally divided on the issue. In *Cassel*, 408 F.3d at 633, the court undertook a close analysis of the plurality and separate opinions in *Black* and held that speech qualifies as a true threat "only upon proof that the speaker subjectively intended the speech as a threat." The holding in *Cassel*, however, was not followed in *United States v. Romo*, 413 F.3d 1044, 1051 (9th Cir. 2005); *Romo*, in turn, was questioned in *United States v. Stewart*, 420 F.3d 1007, 1017-18 (9th Cir. 2005). *Stewart* did not attempt to reconcile the intra-circuit conflict because the statute at issue in that case contained an intent element and the evidence established a true threat under either a subjective or objective definition. *Id.* The latest Ninth Circuit pronouncement on threat doctrine

(continued...)

in *Black*—that the Virginia statute was unconstitutional because its prima facie intent provision effectively eliminated the requirement of proving intent—also suggested that subjective intent to threaten was required. *Cassel*, 408 F.3d at 631. This circuit has not yet addressed the issue. *See Fuller*, 387 F.3d at 646 (a post-*Black* true threats case applying, without reference to *Black*, the traditional objective "reasonable person" test).

It is possible that the Court was not attempting a comprehensive redefinition of true threats in *Black*; the plurality's discussion of threat doctrine was very brief. It is more likely, however, that an entirely objective definition is no longer tenable. *See Cassel*, 408 F.3d at 631-33. But whether the Court meant to retire the objective "reasonable person" approach or to add a subjective intent requirement to the prevailing test for true threats is unclear. If the latter, then a standard that combines objective and subjective inquiries might satisfy the constitutional concern: the factfinder might be asked first to determine whether a reasonable person, under the circumstances, would interpret the speaker's statement as a threat, and second, whether the speaker intended it as a threat. In

---

[2] (...continued)

indicates that the conflict remains unresolved. *See Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008). For an excellent summary of post-*Black* developments on this issue, *see* Paul T. Crane, *"True Threats" and the Issue of Intent*, 92 VA. L. REV. 1225, 1261-68 (2006).

other words, the statement at issue must objectively *be* a threat and subjectively be *intended* as such.

We need not resolve the issue here. Parr asked the district court to instruct the jury on his intent, and the judge obliged, telling jurors they could convict only if Parr "intended his statement to be understood" as a threat. As we have noted, Parr did not challenge this instruction on appeal (it is doubtful he could have since he requested it), and at oral argument he disavowed any claim of instructional error. Parr put his intent at issue, and the jury was instructed to evaluate Parr's statements for their objective meaning *and* Parr's subjective intent. Accordingly, the background evidence of Parr's anti-government convictions and his history of bombmaking was highly relevant.

Putting the intent issue to one side, there is a separate point here about the relevance of a speaker's attitudes and background in deciding whether a statement is a threat. An important purpose of antithreat statutes is to empower law enforcement to stop those who threaten violence before they attempt to carry out their threats—as we put it in a slightly different context, to allow police to arrest a would-be assassin before "the President finds himself staring down the barrel of a loaded gun." *Hoffman*, 806 F.2d at 707; *see also Fuller*, 387 F.3d at 647. To perform that function, law enforcement—the FBI, police, prosecutors—must evaluate the speaker's statements, so an objective contextual interpretation matters. Of course, law enforcement officers have access to a wide variety of information about a suspect—among other things, the

suspect's history of violence, experience with weaponry, background attitudes and activities—and all of this information will reasonably inform their interpretation of his statements.

In short, when a person says he plans to blow up a building, he will naturally be taken more seriously if he has a history of building bombs and supporting terrorism. The upshot is that in a threat case, information about the defendant's background is at least potentially relevant to gauging whether his statements qualify as a true threat. That isn't to say that all background information is admissible; the probative value must still be weighed against the potential for prejudice, *see* FED. R. EVID. 403, but related background evidence is relevant and potentially admissible.

Parr correctly notes that a number of our cases have assessed whether a statement is a threat by considering how the speaker should reasonably have expected it to be interpreted "'by those to whom the maker communicates a statement.'" *See, e.g., United States v. Khorrami*, 895 F.2d 1186, 1192-93 (7th Cir. 1990) (quoting *Hoffman*, 806 F.2d at 707). Applied strictly, this language might suggest that a speaker's background is relevant only if it was known to (and therefore had the potential to affect the interpretation of) his intended audience—in this case, Parr's cellmate, who wasn't aware of all of the specifics of Parr's history as described by his former girlfriends and neighbors. But we have not applied this test consistently. *See Saunders*, 166 F.3d at 913-14 (contrasting the "reasonable speaker" and "reasonable listener" cases); *United*

*States v. Aman*, 31 F.3d 550, 553 (7th Cir. 1994) (quoting *Schneider*) (applying a reasonable listener test); *Schneider*, 910 F.2d at 1570. Although our circuit "treats as relevant evidence both the victim's response to a statement and the victim's belief that it was a threat," *Saunders*, 166 F.3d at 913, we have never limited the inquiry to either the speaker's perspective *or* the targeted victim's perspective.

For example, in *Hoffman*, the defendant mailed a threatening letter to the President, and we thought it relevant that the Secret Service and the staff of the White House mailroom took the letter seriously, even though they weren't the targets of the threat. 806 F.3d at 712. Other information about the defendant's background was relevant to the analysis—for example, that he was a member of a group whose leader had been refused a pardon by the President—even though there was no evidence to suggest that this background information was known to either the White House staff or the President.[3] *Id.* at 708-09. Other cases have also considered

---

[3] *Hoffman* also considered this evidence as relevant to the defendant's "willfulness" in making the threat, a requirement the court apparently understood to mean that the defendant intended his statement to be understood as a threat. 806 F.2d at 706-07. The threat statute at issue in *Hoffman*, 18 U.S.C. § 871(a), prohibits any person from "knowingly and wilfully" making any threat of harm to the President; the opinion's discussion of the defendant's intent, however, centered not on the statute but on whether the First Amendment's threat doctrine required proof that the defendant intended to *carry out* the threat or simply proof that the defendant intended his statement to be

(continued...)

contextual information that wouldn't strictly be relevant if the inquiry were as limited as Parr suggests—for example, the reaction of the target of a threat even when the speaker did not communicate the threat to the target, *Schneider*, 910 F.2d at 1570, and even when the speaker tried to prevent the target from learning of it, *United States v. Martin*, 163 F.3d 1212, 1214-16 (10th Cir. 1998).

The lesson of these cases is that the true threat determination is informed by but not limited to what the recipient or target of the alleged threat knew about the defendant. Contextual information—especially aspects of a defendant's background that have a bearing on whether his statements might reasonably be interpreted as a threat—is relevant and potentially admissible regardless of whether the recipient or targeted victim had full access to that information.

This brings us to the question of whether the evidence at issue here should have been admitted, which depends not just on its relevance but also on its potential to cause unfair prejudice. The district judge concluded that the relevance of the background evidence was not substantially outweighed by any potential for unfair prejudice, and that was not an abuse of his discretion. The jury knew from Parr's recorded statements that he claimed to have vast knowledge of and experience with explosives. Admitting evidence that his claims were actually true was hardly unfairly prejudicial to him. The challenged evidence was properly admitted.

---

(...continued)
interpreted as a threat.

There is, however, one evidentiary matter that raises a separate concern. As part of its case, the government sought to introduce *The Anarchist Cookbook*, a book that Parr referenced in his prison-cell conversations and that had been found in his possession prior to his imprisonment. The judge initially held that only relevant portions of the book would be admitted into evidence, subject to a "specific showing of relevance" for each section admitted. But he later permitted the whole book to go to the jury during deliberations.

That was an abuse of discretion. Although portions of the book were indeed relevant because Parr had discussed them in his conversation with Schultz and because they refuted his defense that he was merely engaged in hyperbole, much of the book was irrelevant. *The Anarchist Cookbook* is a hodgepodge of instructions for committing an array of illegal activities, many of which have nothing to do with explosives and could only risk inflaming the jury. So while the sections referring to homemade explosives were admissible, other sections—some of which describe the manufacture and use of drugs, guns, and other weaponry, for example—should not have been presented to the jury. *United States v. Rogers*, 270 F.3d 1076, 1081 (7th Cir. 2001) ("the prosecutor should have been limited to using those portions of the book pertinent to the charge"). The proper approach would have been to photocopy and admit the relevant pages, rather than send the entire book to the jury room.

But we conclude the error was harmless. *See United States v. Sutton*, 337 F.3d 792, 797 (7th Cir. 2003). The book was a

very small portion of the government's case, and the evidence against Parr was overwhelming, *see United States v. Holt*, 170 F.3d 698, 702 (7th Cir. 1999) (improper admission of *The Anarchist Cookbook* was not reversible error when other evidence against defendant was "overwhelming"). The irrelevant sections of the book were never discussed during the trial, and the jury was specifically instructed that Parr was not on trial for his political views. We doubt that the jury focused undue attention on the irrelevant sections of the book.

## B. Sentencing Issues

### 1. The Guidelines Enhancements

#### a. Obstruction-of-Justice Enhancement

Parr next challenges his sentence, arguing first that the district court improperly applied the obstruction-of-justice enhancement. *See* U.S.S.G. § 3C1.1. The judge found that Parr lied on the witness stand when he testified about his initial interview with the FBI. Contrary to Parr's argument, the district judge made the necessary findings to support his conclusion that Parr had perjured himself. The judge specifically found that Parr lied, that his lie was material, and that the lie was intentional. That was all that was required. *See United States v. Dunnigan*, 507 U.S. 87, 94-96 (1993); *United States v. Frietag*, 230 F.3d 1019, 1026 (7th Cir. 2000) (judge need only find that testimony was "intentionally given, false, and material").

Parr also contends that the court misinterpreted his testimony, but we see no clear error in the judge's inter-

pretation. *See United States v. Jackson*, 300 F.3d 740, 749 (7th Cir. 2002). Parr testified that at his initial FBI interview, he admitted making the statements for which he was charged and said he told the agents that his comments weren't serious. He testified that by the end of his interview, he had decided to "lawyer up" and began denying everything. But he insisted he had initially been truthful with the FBI:

> [PARR]: At the beginning of the conversation they said did you intend to do this? And I said of course not.
>
> [PROSECUTOR]: And then they asked, did you say that you would do it? And you said of course not, right?
>
> [PARR]: No. I admitted that we'd had the conversation in the beginning, without saying specifically did you say this word? . . . It wasn't that specific. In the beginning was did you have a conversation? Yes. Did you talk about blowing up the building? Yes. Were you gonna do it? No, of course not.

Parr later summed up his initial conversation with the FBI as follows: "I said it wasn't real; I didn't mean it. It wasn't real."

But one of the FBI agents who interviewed Parr told a completely different story. According to the agent, Parr initially denied having made the statements:

> [AGENT HAMMEN]: Again, as soon as we sat down with [Parr], we made it clear that we were there to get to the truth. To the bottom of this. What was going on.

And again he denied—he put it on to his cell mate, and then denied it.

[PROSECUTOR]: At any time did he tell you that he had made statements about making a bomb, but they were just make believe? Or responding to his cell mate? Or any kind of what you heard today?

[AGENT HAMMEN]: No, he never brought that up.

[PROSECUTOR]: Okay. So the explanations that Mr. Parr just gave about his interview are not consistent with your recollections?

[AGENT HAMMEN]: That's correct.

It is hard to imagine how the agent's testimony and Parr's could be viewed as anything but contradictory. It was not clear error for the judge to interpret Parr's testimony as materially different from the FBI agent's, and to conclude that Parr had perjured himself. The obstruction-of-justice enhancement was properly applied.

### b. Crime-of-Terrorism Enhancement

Parr next challenges the district court's application of U.S.S.G. § 3A1.4, which applies a 12-level enhancement for an "offense . . . that involved, or was intended to promote, a federal crime of terrorism." The Application Notes provide that a " 'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." U.S.S.G. § 3A1.4 cmt. n.1. That statute, in turn, defines a "[f]ederal crime of terrorism" as an offense that is (1) "calculated to influence or affect the conduct of gov-

ernment by intimidation or coercion, or to retaliate against government conduct"; *and* (2) listed in 18 U.S.C. § 2332b(g)(5)(B)(i). 18 U.S.C. § 2332b(g)(5)(A) & (B). The definition is stated in the conjunctive, so both requirements must be met. Parr's crime of conviction is specifically listed in 18 U.S.C. § 2332b(g)(5)(B)(i); the only question is whether it met the first requirement.

The district judge found that Parr's threat was "not calculated to influence or affect the conduct of government" because it was uttered to his cellmate. Accordingly, he concluded that Parr's crime of conviction was not itself a "federal crime of terrorism." But the judge applied the guideline anyway because the act Parr *threatened* to commit—the bombing—*was* a crime of terrorism, and that meant his offense "involved" a crime of terrorism within the meaning of § 3A1.4.

The term "involve" as used in the guidelines is not quite so broad; it means "to include." *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) (citing *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001)). Thus, we have held that an offense "involves" a federal crime of terrorism only if the crime of conviction is itself a federal crime of terrorism. *Id.* On this understanding, if Parr's crime—the threat—was not itself a federal crime of terrorism as defined in § 2332b(g)(5)(A) *and* (B) (and the district court found that it was not), then the offense did not "involve" a federal crime of terrorism.

Because of this error, we must vacate Parr's sentence and remand for resentencing. It is still possible, however, that § 3A1.4 might properly be applied on remand.

The enhancement contains an alternative application: the guideline also applies if a purpose of Parr's offense was to "promote terrorism." The district court did not determine whether the "promote terrorism" variation of § 3A1.4 applies and should do so on remand. *See Arnaout*, 431 F.3d at 1002 ("[Section] 3A1.4 must be considered when a defendant is convicted of a federal crime of terrorism . . . or when a defendant's felony conviction or relevant conduct has as one purpose the intent to promote a federal crime of terrorism."); *see also United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (the "promote" language in § 3A1.4 "cast[s] a broader net" than the "include" language, and "if [the defendant's] purpose is to promote a terrorism crime, the enhancement is triggered"); *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001) ("A defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism.").

### 2.  The Government's Cross-appeal

Because we are vacating and remanding for resentencing, we do not reach the government's cross-appeal, which argued that the 10-year below-guidelines sentence was unreasonable. Parr's sentence is indeed surprising—a full 20 years below the low end of the guidelines range of 360 months to life. In at least one recent case, we have reversed

a deviation of similar proportional magnitude. *See United States v. Omole*, 523 F.3d 691, 698-99 (7th Cir. 2008). And although such a large deviation might be reasonable in some circumstances, it would require a rather strong justification, *Gall v. United States*, 128 S. Ct. 586, 597 (2007), which we aren't sure is present here. Nevertheless, after *Gall*, our review of a nonguideline sentence is extremely deferential. *See United States v. Carter*, No. 07-2438, 2008 WL 3844058, at *3 (7th Cir. Aug. 19, 2008). In light of the remand, however, we need not decide whether the district court's justification would survive review. We will not speculate on whether the guidelines range or the sentence will remain the same following resentencing; both may be challenged in a second appeal.

## C.  Miscellaneous Issues

Parr raises a number of other issues, which merit only brief mention. He argues, for example, that the judge improperly influenced the jury by mistakenly referring to him as "Mr. McVeigh" at one point during the trial. Parr's attorney did not object, move for a mistrial, or ask the judge to recuse himself, so we review for plain error, *see* FED. R. CRIM. P. 52(b), a standard that is not met here because the judge's comment had no potential to influence the jury. Indeed, it was clear from the context that the judge simply misspoke (this probably explains why Parr's attorney did not object), and in case there was any doubt, the judge immediately apologized and corrected himself.

Parr also argues that his sentence was unconstitutional under *Cunningham v. California*, 127 S. Ct. 856 (2007), because it was based on facts not found beyond a reasonable doubt by a jury. This argument has been repeatedly rejected. *United States v. Savage*, 505 F.3d 754, 764 (7th Cir. 2007) (rejecting argument that *Cunningham* "precludes district judges from finding facts that may enhance sentences"); *United States v. Roti*, 484 F.3d 934, 937 (7th Cir. 2007) ("*Cunningham* . . . has no effect on post-*Booker* federal practice.").

For the foregoing reasons, we AFFIRM the judgment of conviction, VACATE the sentence, and REMAND for resentencing.